378 So.2d 479 (1979)
J. Pat SMITH et ux.
v.
Irl D. "Coti" ANDREPONT, Jr., Etc.
No. 12855.
Court of Appeal of Louisiana, First Circuit.
November 12, 1979.
Rehearing Denied December 27, 1979.
Writ Refused February 15, 1980.
*480 Charles S. McCowan, Jr., Baton Rouge, for plaintiffs-appellees J. Pat Smith and Mrs. J. Pat Smith.
Stacey A. Moak, J. D. DeBlieux, Norman W. Ershler, Baton Rouge, for defendant-appellant Irl D. "Coti" Andrepont, Jr., d/b/a Donco Quarter Horses.
Before COVINGTON, LOTTINGER and COLE, JJ.
COVINGTON, Judge.
This is a redhibitory action brought by the plaintiffs, J. Pat Smith and Mrs. J. Pat Smith, against the defendant, Irl D. "Coti" Andrepont, Jr., d/b/a Donco Quarter Horses, to rescind the sale of certain "yearling American Quarter Horse Association horse filly by `Triple Mayday' and of `Joe's Leo Lena,'" for which the plaintiffs allegedly paid the purchase price of $4,250.00. The sale was made on October 15, 1977, with delivery of the horse on October 22, 1977. The plaintiffs contend that on December 8, 1977, they learned that the horse had "founder" and would have to be destroyed. The plaintiffs further alleged that on December 9, 1977, they had the subject animal examined by veterinarians at the LSU Veterinary Center, and "learned that at the time of the sale the horse suffered from chronic laminitis, commonly known as `founder,' which condition makes the horse totally unfit for the purposes intended." The petition set out that the plaintiffs' express purpose in buying the horse, which was communicated to the defendant, was "to have a registered quarter horse which was fit for show, pleasure and breeding."
In addition to seeking return of the purchase price, the plaintiffs sought damages in the amount of $1,550.00 for expenses incurred in connection with the animal. The defendant denied the pertinent allegations of the petition; and asserted that the horse was sound in all respects; and if it was lame, the lameness resulted from the plaintiffs' acts. Subsequently, the plaintiffs increased their demand for damages to the amount of $2,686.00.
This matter was tried on December 18, 1978; thereafter, the trial judge decided the suit in favor of the plaintiffs, assigning written reasons therefor on January 22, 1979. Then, on January 24, 1979, he assigned supplemental written reasons to include additional items of damage. Judgment in the amount of $6,524.00[1] was signed on January 30, 1979. After a denial of the defendant's motion for a new trial, he appealed.
We have consistently recognized the principal that findings of fact reached by the trial judge (trier of fact) should not be reversed unless his conclusions are manifestly erroneous. Muller v. A. K. Durnin Chrysler-Plymouth, Inc., 361 So.2d 1257 (La. App. 1 Cir. 1978), writ denied, 363 So.2d 915 (La.1978). We have reviewed the record and find no manifest error; on the contrary, we are convinced that the evidence supports the trial court's finding that the horse contained a redhibitory vice at the time of the sale.
The general redhibition law is to be found in Articles 2520 and 2521 of the Louisiana Civil Code.
LSA-C.C. art. 2520 provides:

"Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice."
LSA-C.C. art. 2521 states:
"Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices."
The vices and defects in animals for which the redhibitory action may be *481 brought are latent vices of body and vices of character. LSA-C.C. arts. 2524-2528. Vices of the body are classified as absolute or relative. The "bare existence" of an absolute vice gives rise to the redhibitory action. LSA-C.C. art. 2525. "Founder" is one of the vices in a horse which is specifically declared to be an absolute vice. Article 2526 states:
"The absolute vices of horses and mules are short wind, glanders and founder."
In his Written Reasons for Judgment, the trial judge stated:
"In this case, the Court accepts the testimony of Drs. Baker, Waters[2] and O'Cain as being the more accurate and convincing. Drs. Waters and Baker gave detailed scientific reasons for their opinion that the horse was foundered at a minimum or more than 4 months prior to December 9, 1977.
"The testimony of Hubert Matthews corroborated the testimony of Drs. Baker and Waters. Matthews said that the horse was continually lame and had been feed foundered in February or March of 1977."
Dr. Clarence B. Baker, a veterinarian, testified by deposition. He examined the horse on December 8, 1977 and treated it for about one week. He diagnosed the condition as chronic laminitis or founder.
Dr. Baker's testimony:
"Q. So, in your expert opinion, you examined this horse in December; was there any way that this horse did not have this condition in September of 1977?
A. She should have had the condition at least for four and a half months; she would have had to have it at least four and a half months."
* * * * * *
"Q. In your expert opinion is there any way that this horse could not have had this condition in September of 1977, some three months before?
A. No. My opinion is that it occurred prior."
Then, Dr. Baker continued:
"Q. And it is your opinion that conservatively this filly foundered approximately four months from December the 9th?
A. I said a minimum of four and a half months."
* * * * * *
"Q. But you are certain that the filly foundered at least four and a half months prior to the time you saw it?
A. Yes, sir."
Dr. John W. Watters, a veterinary radiologist at L.S.U., testified at the trial as follows:
"Q. Now, does this condition leave physical evidence that it was there and how long it existed?
A. Yes, in this case, we are talking about chronic laminitis and it does leave by-products which can be identified later radiographically as well as physically."
* * * * * *
"Q. Now, what significance do those rings have in enabling you to tell how long this condition existed?
A. Well, it's commonly accepted that normal hoof grows at approximately one-quarter inch per month."
* * * * * *
"Now, getting back to your question awhile ago, what the significance of this is. A normal hoof grows approximately one-quarter inch per month and some authorities state that this can be up to three-eighths of an inch per month. Now this will vary, depending on feeds and weather conditions and so forth, but if we were to measure from Point A to BI did that one time and I think it measured two and a quarter incheseven taking the slowest or the fastest possible growth here of three-eighths of an inch, I think that's going to come out better than four months' worth of hoof growth.
*482 Q. And so that would be from four months prior to December 9 when the first ring would have formed, is that correct?
A. That's true."
Dr. Watters continued:
"Q. Now, based on your examination and your medical knowledge, would you say that there is any way that this condition could not have existed in this horse as of October 15, 1977?
A. Not in my opinion. These could not have grown that rapidly in a two-month period or less than two months' period."
* * * * * *
"Q. And in your professional judgment, this condition existed as of October 15, 1977 in this horse?
A. It's my opinion this has been here for four months or longer. There's no way of telling. We may have had several rings grown off before we rated that."
* * * * * *
"Q. So that it's possible it existed longer than four months? Four months would be the shortest period of time?
A. That's my opinion."
* * * * * *
"Q. Is there any doubt in your professional opinion, Doctor, that this horse had chronic laminitis prior to the October 15, 1977, sale date based on the evidence that you have examined?
A. I'd say from what I've seen on the radiographs that this has been here for at least four months and this is not based just on the ring formation which is related to a variable of hoof growth but due to the changes we see in the third phalanx itself, a severe demineralization."
Dr. Charles L. O'Cain, a veterinarian, testified as follows:
"Q. And [I] ask you, sir, if you wrote this letter and if you recognize it.
A. Yes, I did.
Q. Does it represent your professional judgment as of September 8, 1978?
A. Yes.
Q. Would you read it to the Court, please?
A. Okay. It's addressed to Mrs. J. Pat Smith. I said, `Dear Mrs. Smith, as per our conversation on August 26, 1978, I have taken radiographs of your two year old quarter horse filly's front feet. After evaluating and comparing them to the ones taken by Louisiana State University approximately nine months ago, I find no significant radiographic changes. As you are aware, we have kept the filly on a strict diet for the past nine months to minimize and try to prevent any more bouts of laminitis. Due to this diet and recurring laminitis, her growth has been severely stunted and she is basically the same weight and height she was nine months ago. I feel that she will never return to a normal state and will continue to have recurring attacks of laminitis. She, therefore, could not be used for working or showing or even as a brood mare. For these reasons and to relieve her of any further pain, undue suffering, and a life of just existing, I feel that she should be euthanized. If you have any questions concerning this matter, please let me know. Very truly yours.'
Q. Now, subsequently on September 30, 1978, did you write a report to Mrs. Smith advising that the horse had been euthanized for humane reasons on September 28, 1978?
A. Yes, I did.
Q. I'll show you what I've marked as P-No. 7 and ask you if that is that notification?
A. Yes, it is."
Further, Hubert M. Matthews who had previously owned the horse testified that the horse had foundered prior to the sale to the Smiths, some time during the early part of 1977, around February or March.
*483 The evidence further reflects that the latent vice was not apparent and that the Smiths did not learn of the condition until December 8, 1977.
Mary F. Smith (Mrs. J. Pat Smith) testified:
"Q. Did anyone prior to your purchase of this horse advise you that this horse had previously foundered?
A. Absolutely not.
Q. Did anyone prior to the time you purchased this horse ever advise you that the horse had any problem with lameness?
A. Absolutely not.
Q. Had you known that would you have purchased the horse?
A. Definitely not."
She also testified:
"Q. Now, let's talk about facts surrounding this thing, Mrs. Smith. When did you first see this horse, do you remember?
A. It was in September of '77.
Q. Okay. Were you at that time or are you now an expert on whether or not a horse has got laminitis?
A. No, I'm not, now or then.
Q. Did the horse appear to be okay to you?
A. As far as I could tell.
Q. All right. How did this come about that you came to buy this horse?
A. Lauryn, who was working with our daughter and our other horse, had seen it, and Stephanie liked it and wasn't having a lot of luck with showing and winning with her other horse, so they thought the horse was an exceptionally marked horse and wanted to get it for showing in the halter and at the LSU Futurity and then, of course, further showing as it got a little bit older.
Q. Okay. When you went out to Mr. Andrepont's place, was the horse in a stable?
A. I did not see it in a stable when we went out there. They had it standing outside. I suppose they had just taken it out of the stable, I really don't know. It was not in the stable when we saw him.
Q. Was it on soft ground?
A. Yes, it was.
Q. Did it appear to walk okay?
A. It appeared to. I really didn't look at how it walked, but it moved. I didn't notice any visible limp or anything."
Also, in this regard, the testimony of J. Pat Smith is pertinent:
"Q. Now, at the time you looked at the horse, did you have a great deal of experience in the horse business?
A. No.
Q. Did you see anything noticeably wrong with the horse?
A. We saw it on a late Sunday afternoon, went out to the barn where it was kept. They brought it out of the stable, walked it around, put it on the walker. We were there about thirty minutes and I observed no physical defects in the horse."
In arguing that the plaintiffs failed to carry their burden of proof, the appellant contends:
"The testimony adduced at trial and by deposition in this case contained some affirmative evidence that founder existed at the time of sale. However, this evidence was entirely after-the-fact, consisting solely of an interpretation of x-rays taken approximately seven (7) weeks after the sale. This `opinion' testimony of plaintiffs' expert witnesses (Drs. Baker, Watters and O'Cain), which constituted 99% of plaintiffs proof regarding founder, was theoretical in nature. More importantly, however, their calculations, and thus their opinion, was based entirely on the assumption that the rings on the horse's hooves were founder rings."
Moreover, the appellant contends that these rings were present long before the sale, and did not relate to laminitis (founder), *484 but rather were caused by an external injury to the hoof wall of the horse's front feet. At trial in support of this position, the appellant had offered his own testimony and the testimony of an expert, Dr. Steven Fontenot, a veterinarian. In addition to this testimony, the appellant-defendant offered the testimony of two of his employees who testified the horse did not have founder and was sound at the time of the sale.
In a large measure the decision by the trial court involved a credibility determination. Hence, we find the rule which mandates affirmation of a factual determination not shown to be manifestly erroneous is particularly appropriate in the instant case. Canter v. Koehring Company, 283 So.2d 716 (La.1973). Also, we followed Schexnayder v. Carpenter, 346 So.2d 196 (La.1977).
The appellant further contends that the trial court did not give sufficient weight to the testimony of the veterinarian Fontenot. As a rule, the evidence of an expert witness is received by a trial court in the same manner as evidence of non-experts, and is to be weighed by the trial judge the same as any other evidence. The trial judge is not bound by expert testimony. Galloway v. Gaspard, 340 So.2d 579 (La.App. 1 Cir. 1976). We find no error.
Concerning the assignment of error regarding the testimony of Hubert M. Matthews, we find that the testimony was properly received. Mr. Matthews was asked whether the horse had ever foundered while he owned it. Defendant objected. The record discloses that the following then transpired:
"Q. Have you ever seen the condition we call founder?
A. Yes, I have.
Q. How many times have you seen it?
A. Quite frequently.
Q. Do you think you're able to recognize it based on your experience in the horse business?
A. Just as good, I think, as anybody else who is not [has no] medical expertise at it.
Q. Now, during the time you owned this horse, did it appear to you that this horse ever had founder?
Mr. Ershler (attorney for defendant):
Your Honor, again I'm going to object. I don't say he has to be an expert but I don't think Mr. McCowan (attorney for plaintiffs) has shown that he has had the experience to recognize the disease. The man merely says he has been around horses.
The Court: I'll overrule the objection.
Q. Go ahead, you can answer the question.
A. Will you repeat that question?
Q. During the time you owned this horse, did it ever appear to you that this horse had foundered?
A. Yes."
Lay testimony is always admissible to prove that which the witness knows and about which he is legally capable of testifying. Arthur v. McConnell, 286 So.2d 499 (La.App. 2 Cir. 1973). We thus find no error in the trial court permitting Mr. Matthews' testimony concerning "founder." The evidence was clearly admissible, as defendant seems to concede. It was really a question of the weight to be given the testimony of Mr. Matthews. As his written reasons indicate, the trial judge merely gave this testimony corroborative effect. It was not the primary evidence on which he based his conclusion that the horse had founder at the time of the sale.
Since we have concluded that the plaintiffs, as buyers, were entitled to have the sale of the horse rescinded, we find that they are entitled to recover the sale price and the necessary expenses of the sale. LSA-C.C. art. 2531.
Relative to the $500.00 award for inconvenience and mental stress, Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La. *485 1976), which involved undue delay in repairing an automobile, is dispositive of the matter. That court held:
"[W]here a principal or exclusive object of a contract is intellectual enjoyment, nonpecuniary damages resulting from the nonfulfillment of that intellectual object are recoverable."
Although such recovery was not allowed in Meador, we find that a principal object in acquiring the horse was for "show" purposes; thus, it is allowed under C.C. art. 1934(3).
For the foregoing reasons, we affirm the judgment of the trial court, at the cost of defendant-appellant.
AFFIRMED.
NOTES
[1] This figure is composed of the following items:

 $4,250.00.... return or purchase price
 839.00.... shoeing, veterinary bills, insurance
 and exercise
 935.00.... boarding
 500.00.... inconvenience
 _________
 $6,524.00

[2] (sic) Watters.