CARTER, Judge.
This is an appeal from a trial court judgment for damages arising out of an automobile accident. Liability is not at issue. Quantum is the only matter before us for review.
FACTS
On August 6, 1981, while driving a vehicle in the course and scope of his employment as a sales representative with Pioneer Fishing and Rental Tools (Pioneer), plaintiff, Thomas Edward Benoit, was struck in • the rear by a truck being driven by defendant John Harvey, owned by his employer, Terrebonne Parish School Board, and insured by Liberty Mutual Insurance Company, the Board’s insurer. At the time of the accident, Harvey was operating the truck in the course and scope of his employment with the School Board. As a result of the accident, plaintiff suffered severe back injuries, leaving him permanently partially disabled and unable to perform the work he was performing at the time of the accident.
There is no dispute on appeal as to the fault of the defendants or the extent of plaintiff’s injuries. The trial judge assessed damages against Harvey, the Terre-bonne Parish School Board, and Liberty Mutual Insurance Company in solido,[1] as follows:
A. Loss of salary and employment related benefits to date of trial .$ 53,8:12.00
B. 1. The present value of salary lost from date of trial forward to end of his life work expectancy $514,347.00
2. Medical Insurance Contributions lost .$ 18,240.00
3. The Value of [Future] Profit Sharing lost .
TOTAL OF B .$558,310.00
C. Present, past and future pain and suffering $ 50,000.00
I). Past Medical Expenses .$ 17,538.70
E. Future Medical Expenses .$ 17,.⅜.!8.70
TOTAL DAMAGES .$007,210.52
Defendants have appealed the trial court’s award for plaintiff’s past and future loss of earnings, as well as its award to the plaintiff for loss of fringe benefits, namely, the profit sharing plan of his employer.
DISCUSSION
At the time of the accident and injury sustained by plaintiff, he was employed as a sale representative of Pioneer at an initial salary of $2800.00 per month. The agreement with his employer was that at the end of six months, plaintiff’s salary would be increased to $3200.00 per month. His employer furnished an automobile and expenses, and paid all but approximately $55.50 of a $182.00 per month hospital *723 ization insurance policy premium, resulting in a fringe benefit of approximately $130.00 per month. Plaintiff was eligible for end of the year bonuses and the company’s pension profit sharing plan. The amount of money paid for bonuses and the pension profit sharing plan varied each year, depending on the company’s annual profits.
Because of the injury and the worsening condition of plaintiff’s back, he was not able to complete the six month period necessary to receive the increase in salary promised. Plaintiff was forced to seek other employment where less automobile driving was required. He applied for a position with Rental Specialties. Mr. Donald Cock-erham, owner of Rental Specialties, testified that he would employ plaintiff upon plaintiff’s release from a doctor’s care. Plaintiff was willing to take the job which was in a field related to his former work, but only involved answering telephones and doing clerical work. The pay for this position would be $1200.00 per month. Mr. Cockerham testified that he would “probably give him [plaintiff] a couple hundred dollars a month increase in a couple months, depending on how it worked out.”
Plaintiff called Dr. Melvin Wolfson, an expert economist, who was the only expert witness to testify with reference to plaintiff’s loss of past and future earnings.- Defendant was given an opportunity post trial to depose an expert economist, but did not do so. Dr. Wolfson testified that he based his calculations for loss of future earnings on the assumption that plaintiff would have made $2400.00 per month had he not been injured, since all employees of Pioneer had their pay cut to $2400.00 per month in October of 1982. He made his projections based on a $2400.00 per month salary for two years and thereafter his projections were based on a 6% annual growth (infla-tion) rate. Further, in calculating future earnings, Dr. Wolfson assumed that plaintiff would actually earn $1200.00 per month. Plaintiff’s actual loss was figured as the difference between this figure and what he would have earned if he could have continued to work for Pioneer (discounting this figure, of course, to find its present value).
It is hornbook law that the factual determination of the trial court should not be disturbed unless the factual findings are unsupported by the record resulting in the trial court abusing its much discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982), writ denied, 414 So.2d 1253 (La.1982). Although a trier of fact is not bound to follow the opinion of expert witnesses, the trier of fact can use the mathematical projections as one of the guides in computing an award. Smith v. Andrepont, 378 So.2d 479 (La.App. 1st Cir.1979), writ denied, 380 So.2d 102 (La.1980); Brown v. Southern Farm Bureau Ins. Co., 426 So.2d 684 (La.App. 1st Cir.1982).
Appellants contend that in light of Mr. Cockerham’s testimony, the figure of $1400.00 per month should have been used to reduce the figure of plaintiff’s future losses, rather than $1200.00 which was used by the economist and adopted by the trial judge.
This was a matter within the discretion of the trial judge. Mr. Cockerham qualified his testimony about possible raises with the statement, “depending on how it worked out.” .The trial judge fairly interpreted this as merely a possibility and too speculative to use the higher figure in reducing future losses. We find no manifest error in this decision.
Appellants further contend that Dr. Wolfson was in error in assuming a 6% inflation rate in projecting plaintiff’s future salary losses. At the time of trial, appellants showed a 3½% inflation rate for a five month period preceeding trial. Appellants maintain that the present inflation rate is only 3½% and any future projections as to inflation rates are pure speculation.
When questioned about the 3½% inflation rate for the previous twelve months and the possible negative inflation rate for the month prior to trial, Dr. Wolfson ex *724 pressed doubt that such a short time period established a significant economic trend. He gave a detailed historical explanation of his reasoning behind the use of the 6% figure as follows:
Q. What have you assumed that his wages will increase over rest of his work life and why have you assumed

A. The assumption that we made was a 6% increase. The consensus by economist of the so called embedded inflation rate, that means the underlying inflation rate, has been estimated right around that level, at 6%. If we look at behavior of inflation, of course, the last several years we find that there has been a fair amount of fluctuation, the rate has been as high as 13%, of course, currently for the latest twelve month period it's been a 3V2%, but, to assume for a very long period of time, thirty years at 6% rate, would be very consistent with the behavior of wages which has occurred over the last thirty years if we look at the historical patterns. So, that a 6% assumption would tract the long term rate of wages and, certainly, would be conservative in the view of recent experience with respect to inflation.
The trial judge was impressed with this testimony and since there is no contradictory testimony in the record, we cannot say that the trial judge was manifestly erroneous in this factual finding.
Appellants further object to Dr. Wolf-son’s using a 7½% discount rate on the loss of future earnings rather than an 8% discount rate. In his testimony, Dr. Wolfson explained his calculation as follows:
Q. Why did you use a 7½% discount factor and would you explain to the court what a discount factor is?
A. Our choice of the 7V2% is simply to suggest that if the court wishes to embrace a standard of discounting, that does not reflect the highest market rates of interest that are available such as in U.S. Government Bonds or the very lowest rates of interest available such as in past (sic) book savings account, 5¾%, or what’s available in guaranteed annuity programs in the 4 to 6% range, it takes something higher. We’ve chosen to illustrate with a lk% to represent the factors of safety, equitity, (sic) protection against risk appropriate term. It’s not an inviolate standard, but, one, perhaps, the court might find meaningful at looking at all of the factors to be considered.
Q. If you take this sum of money, over the mans (sic) lifetime, and you consider giving him monthly payments, this is the sum of money which would make him hold, so to speak, if he went to work today making $1200.00 per month and you increased that $1200.00 per month by • 6%?
A. Yes.
Q. And, in this $514,000.00 figure have you included the medical fringe benefits figure?
A. I have calculated those separately.
Q. What is the value of his medical fringe benefit through the rest of his work life expectancy?
A. The medical, assuming that the cost of medical insurance contribution will not vary, assuming it remains constant, and assuming that we discounted at 7½%, the present value of the medical contribution, insurance contribution, would be $18,246.00.
Appellants argue Dr. Wolfson used the 8% figure in another trial near the time of the instant one and should do so here. Dr. Wolfson explained that the factors in that case were completely different. The other case involved, among other factors, a death and a different period of time. The trial judge accepted this testimony. No expert was offered by appellants to refute Dr. Wolfson’s testimony. We cannot say that the trial court erred in its adoption of Dr. Wolfson’s figures concerning loss of future earnings.
*725 Appellants’ final contention is that the trial court erred in awarding the sum of $2,449.00 for past loss of profit sharing and the sum of $25,717.00 as future loss of profit sharing. We agree.
Dr. Wolfson testified as follows:
Q. ... Did you, in considering your testimony today, look into pension plans, profit sharing plans or anything like that?
A. I was asked to make an assumption about that, yes, sir.
Q. What assumption did you make?
A. I was asked to assume that the employers contribution to profit sharing pension plan would be 5% of his salary.
Mr. Lendell Toups, district manager for Pioneer, testified as follows:
Q. Did, and when I ask you these questions, Pm only referring to the salse-man (sic) like Mr. Beniot (sic), did he have a pension plan or profit sharing plan?
A. Yes, profit sharing.
Q. And, how was that computed?
A. That’s based on the profits of the company, they put anywhere from zero to ten per cent of your gross salaries, at that year.
Q. And, this would be put into a side fund?
A. Right.
Q. Do you know how much was put in in 1981?
A. ’81 I think 5%.
This area of damages is highly speculative and more proof than the district manager’s estimation of one year’s profit sharing is necessary. Plaintiff did not produce the company books or records to try to establish a history or pattern of profits or of payments made by Pioneer into the pension profit sharing plan.
There was no testimony as to the company’s projected profits. The testimony presented, standing alone, can not guide a fact finder to a certain figure for purposes of awarding damages for future loss of profit sharing. The testimony of Mr. Toups as to the amount paid into the fund in 1981 was the totality of the proof presented by plaintiff as to the amount of the 1981 profit sharing fund.
This lack of evidence and corroboration convinces us that the trial judge was clearly wrong in granting these awards. In view of this lack of proof, we hold the trial court erred in allowing damages of $2,449.00 for past loss of profit sharing benefits and $25,717.00 for loss of future profit sharing benefits. Accordingly, we amend the judgment, reducing plaintiff’s award for past lost earnings which included an award of $2,449.00 for past loss of profit sharing benefits from $53,832.00 to $51,383.00 and reverse the award of $25,-717.00 for loss of future profit sharing benefits.
For the above and foregoing reasons, the judgment of the trial court is herein amended so as to reduce the award for past loss of earnings by $2,449.00, which represented contributions in the form of pension profit sharing. The judgment of the trial court is reversed insofar as it awarded plaintiff $25,717.00 for future loss of profit sharing benefits. In all other respects, the judgment is affirmed. Costs of this appeal are assessed against appellants.
REVERSED IN PART, AMENDED AND, AS AMENDED, AFFIRMED.

. Liberty Mutual’s liability was limited to S250,-000.00, the extent of its policy.