571 So.2d 690 (1990)
Don Ray WALKER, Plaintiff-Appellant,
v.
Alan W. BANKSTON and State of Louisiana, Department of Wildlife and Fisheries, Defendants-Appellants.
No. 21949-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1990.
*693 Bruscato, Loomis & Street, by C. Daniel Street, Monroe, for Don Ray Walker, plaintiff-appellant.
Hayes, Harkey, Smith, Cascio & Mullens, by Francis C. Broussard, Monroe, for Alan W. Bankston and State of LA, Dept. of Wildlife & Fisheries, defendants-appellants.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
MARVIN, Chief Judge.
In this personal injury-damage action arising out of a collision between a Stateowned pickup and a three-wheeled ATV vehicle, both drivers appeal from a judgment that awarded the ATV driver $137,427 in damages and allocated fault 90 percent to that driver and 10 percent to the pickup driver, who was a State game warden.
The accident occurred on a dark, wet night on a rural state highway when neither vehicle had its lights on. A jury assessed the damages and fault against the two drivers. The trial judge relied on the jury verdict and pronounced the same result against the game warden's employer, the State of Louisiana, Department of Wildlife and Fisheries, who also appeals. One judgment was rendered and signed by the court.
Plaintiff, Don Ray Walker, seeks to increase the award and to decrease the fault assessed to him. Defendants, Game Warden Alan Bankston and the State, as his employer, seeking reversal, contend that because Bankston was in the course of his official duties, seeking to arrest Walker and others who were engaged in the illegal spotlighting-hunting deer at night, he did not breach any duty owed to Walker and was not negligent in any respect.
We amend to increase the general damage award and, as amended, affirm the judgment.

FACTS
We summarize the facts of the accident in the light that most favorably supports the judgment.
Walker, age 29, and two friends about the same age were drinking beer and illegally spotlighting and shooting at deer in the area adjacent to the Gum Ridge Road in Morehouse parish, a public blacktopped highway on January 18, 1988. Walker and one friend shot one or more times from the pickup truck which they occupied. In response to neighbors reporting what they had seen and heard, the local game warden, Bankston, drove the state pickup assigned to him to the area. Seeing the suspect truck sweep the beam of its headlights across the fields adjacent to the road in a maneuver which he knew was used to spotlight deer, Bankston turned off his lights and proceeded to drive on Gum Ridge Road toward the suspect truck, intending to arrest the occupants for illegal night hunting.
Shortly before Bankston arrived, Walker and his friends unloaded from their pickup the three-wheeler ATV, which Walker mounted and started while he watched the pickup drive out of his sight. Walker then began to slowly drive on the road without lights, apparently intending to search for any wounded or dead deer in the area where he and his friend had spotlighted and shot at them.
Bankston, with his lights off, was driving about 15 or so mph in the direction that the suspect pickup had driven. He intended to apprehend the occupants of the suspect pickup, anticipating that the truck would stop while spotlighting deer. The respective vehicles of Bankston and Walker were approaching each other on the highway.
Because it was dark, cloudy and wet, neither Bankston nor Walker saw the other's vehicle. The two vehicles collided near the center of the blacktopped roadway. Bankston agreed that he was driving "more or less in the middle of the road" when he felt and heard a "thump" and impact and immediately applied his brakes. Bankston said, "At ... impact I caught [by sight] something coming over my left side. I knew whatever had hit me was ... behind *694 me." The plastic cover of the front left-turn indicator light of Bankston's truck was found about two inches from the center line of the road in Walker's lane of travel. The investigating trooper deduced that the impact occurred near the center of the road.
Walker was severely injured, internally and externally, especially on his left side. His mangled left leg was surgically amputated about four inches below the knee. Above the knee, he had a comminuted and displaced fracture of the femur and a broken rib.

THE ASSIGNMENTS
Walker contends that the trial court erred (1) in confirming the jury's assessment of fault; (2) in confirming the jury's awards for general damages and lost past and future wages and earning capacity; (3) in several evidentiary rulings; (4) in failing to give a requested jury instruction in its entirety regarding loss of earning capacity; and (5) in its assessment of court costs.
The State and Bankston contend that the trial court erred (1) in confirming the jury's assessment of fault; (2) in confirming the jury's award of damages; (3) in several evidentiary rulings; and (4) in failing to charge the jury with R.S. 32:395 as requested.

RESOLUTION
In answer to interrogatories, the jury allocated fault 90 percent to Walker and 10 percent to Bankston. We have no difficulty concluding that the conduct of both Walker and Bankston caused the collision. This but-for inquiry is the first step in the analysis of the relationship between the duty and particular risk in negligence cases. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
If the accident and Walker's resulting injuries would not have occurred but for Bankston's failure to use his headlights, cause-in-fact is shown. It is not necessary that Bankston's action be shown to be the sole cause of the accident as it is sufficient if it is shown to be a substantial cause.
Bankston subtlely suggests that the accident might have occurred even if his headlights had been on because Walker was coming out of the curve which Bankston was entering. Although expert testimony suggested that Walker's vehicle may have crossed over the center line into Bankston's lane of traffic, there is no preponderance of evidence to support that suggestion. Had Bankston's headlights been on, the collision most probably would not have occurred. We therefore conclude that Bankston's failure, like Walker's, to use headlights was a substantial factual cause of the accident. Gresham v. Davenport, 537 So.2d 1144 (La.1989).

BANKSTON'S DUTY
As a driver of an authorized emergency vehicle in pursuit of a violator of the law, Bankston nonetheless had the duty to drive with due regard for the safety of all persons. LRS 32:24. This duty is statutorily mandated even though the driver of the emergency vehicle is exempt from highway regulations according to LRS 32:24. Bankston's practice of pursuing nighthunters without headlights so as to remain undetected does not relieve him of his general duty to drive with due regard for the safety of others.
Bankston's argument that the risk that this accident would occur does not fall within the scope of his duty cannot stand against the clear language of LRS 32:24. His general duty extends to all persons. The statute makes no exception. Neither do we.
LRS 32:301 requires that headlights be used by every vehicle upon a highway between sunset and sunrise. Authorized emergency vehicles are not excepted from complying with this requirement by LRS 32:24. Bankston argues that he is excepted from LRS 32:301 by LRS 32:395 which provides
[e]xcept as otherwise provided ... by this Chapter, authorized agents of the commissioner shall not be impeded from exercising the functions of their office or performing their duties in the enforcement of ... any ... law of this state *695 within the scope of their authority upon any highway ...
Bankston's argument ignores the preface to the statute: "except as otherwise provided... in this Chapter." LRS 32:24 provides "otherwise" by listing the highway regulations from which drivers of emergency vehicles are exempt, as well as the conditions which must be met before the exemption applies.
LRS 32:24 does not except drivers of emergency vehicles from the mandatory use of headlights during the times specified in LRS 32:301. The riskthat Bankston would collide with someone or something while driving without headlights on a road, not otherwise illuminated, in a sparsely populated rural area on a dark and cloudy nightfalls within the scope of his duty to drive with due regard to the safety of others.
Bankston breached this duty. This is actionable negligence under CC Arts. 2315 and 2316. Gresham v. Davenport, supra.

FAULT
Findings of respective percentages of fault under CC Art. 2323 are factual findings not to be disturbed on appeal unless, for well articulated reasons, they are determined to be clearly wrong, manifestly erroneous. Whether a fact-finder determines a party to be one percent at fault, totally at fault, or somewhere in between, the manifest error rule applies. Different juries and jurors may reach different conclusions on the question within a reasonable range. Devereux v. Allstate Ins. Co., 557 So.2d 1091 (La.App. 2d Cir. 1990). Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
Walker does not dispute his negligence in failing to use the headlights on his vehicle. He contends that the jury was clearly wrong in its allocation of fault, arguing that Bankston's fault is equal to his fault.
Bankston argues that the jury was clearly wrong in assessing any fault to him because he was in a possibly dangerous situation pursuing suspected violators of the state game laws.
Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), suggests these considerations to compare fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
We agree that the greater fault must rest with Walker and the lesser fault with Bankston. Aware of the possibility that law enforcement officials might be in the area because he knew that nighthunting was illegal, Walker boarded the threewheeler to search for deer that he may have killed or wounded. Therefore Walker was continuing his illegal nighthunting when the accident occurred. There was no evidence presented to show that Walker was incapacitated.
On the other hand, Bankston was pursuing the occupants in the suspect pickup truck. Bankston observed the pickup sweep its headlight beams across the field in a maneuver Bankston knew was used to spotlight deer. Bankston had previously traversed the road that the pickup was traveling on. By this experience, he believed that there would be nothing in or on the side of the road that would have obstructed his path. He knew the violators were armed. He was in a possibly or potentially dangerous situation performing his duties as a game warden.
This record and consideration of the Watson factors support the jury's allocation of fault. While other reasonable minds could have made a different or lesser allocation more pleasing to Walker, which we perhaps would have affirmed, we do not find that the jury was clearly wrong in its factfinding under CC Art. 2323.

QUANTUM
Walker contends that the damage awards for general damages and loss of past and future earnings and earning capacity are unconscionably low. The jury *696 awarded $30,000 for physical injury, pain and suffering and mental anguish, past, present and future; $10,000 for permanent disfigurement and disability; and $30,000 for lost past and future wages and earning capacity. Walker does not complain of the awards for past and future medical expenses.
Walker lost between eight and ten inches of bone in his lower left leg, suffered a comminuted fracture of the left femur with a displaced fragment and a fractured rib.
Walker underwent two surgeries where debridement procedures were performed before consenting to the amputation of his left lower leg in a third surgery. Walker's left leg was eventually amputated four inches below the knee and pins were placed in his left thigh. Debridement and lavage procedures were performed on four following surgeries before the stump was closed in an eighth surgery. An open reduction was performed on the left femur and a 15-inch intermedulary rod was placed in Walker's left femur during his eighth surgery.
Distal screws were fixed in place in a ninth surgery. The displaced fragment of the femur was left in place and caused a knot on Walker's left thigh. Walker had to take anticoagulant medication to counter a blood clot that later occurred in his left leg and to prevent further clotting.
Walker was initially hospitalized from January 19 until February 26, 1988, being in traction from January 19 to February 1. On March 3, 1988, Walker was readmitted and remained hospitalized for four days because the anticoagulant overly thinned his blood. He suffered depression and severe pain. Blisters, rashes, and irritations later arose because of the prosthesis. The problems are expected to continue. The prosthesis will have to be changed every two to four years as a result of stump shrinkage. Experts estimated Walker's medical disability at 40 percent of his body as a whole.

GENERAL DAMAGES
The award of $40,000 total for pain and suffering and permanent disfigurement and disability is obviously abusively low. Where a damage award is abusively low, we raise it to the lowest amount we would have affirmed. Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987) writ denied.
In Finley v. North Assur. Co. of America, 476 So.2d 837 (La.App. 2d Cir.1985), we deemed $250,000 in general damages to be a reasonable and just award for a 20-yearold woman whose right leg was amputated below the knee, left leg was broken, bladder was punctured, and pelvis was fractured.
In Byrd v. Bossier Parish School Bd., 543 So.2d 35 (La.App. 2d Cir.1989), writ denied, we awarded $650,000 in general damages to a 14-year-old boy whose leg was amputated just above the knee and who was in a full body cast for six weeks.
We determine that $220,000 is the lowest amount we would affirm as just and reasonable under the circumstances of this record.
An award for impairment of earning capacity encompasses the loss of one's earning potential and is not predicated merely upon the difference between a plaintiff's earnings before and after a disabling injury. In determining the loss of earning capacity, we look to the disabled person's capacity to do that which he may be actually or potentially reasonably qualified by nature, training and experience, and for which he may receive recompense. Wactor v. Pickens Lumber Co., supra.
Loss of earning capacity is not limited to actual lost earnings. One may recover for the impairment of his earning capacity. Brooks v. Chicola, 514 So.2d 7 (La.1987). Damages may be assessed for the deprivation of what an injured plaintiff could have earned despite the fact he may never have seen fit to take advantage of that capacity because the injury has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it. Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writ denied.
*697 Although the loss of future earning capacity cannot be calculated with mathematical certainty, one who claims an earning incapacity must prove his loss with some reasonable degree of certainty. The award cannot be based on speculation, possibility or conjecture. Wactor v. Pickens Lumber Co., supra.
Both Walker and Bankston presented expert testimony about Walker's lost past and future wages and earning capacity. The major difference in the calculations of the two experts was that Walker's expert, Dr. Charles Bettinger, used Walker's average hourly wage in his calculations whereas Bankston's expert, Dr. Ernest Moser, used Walker's average annual income.
Dr. Bettinger uses the average hourly wage where a person's work history shows sporadic employment because it more accurately represents a person's ability to work. Dr. Moser uses average annual income rather than an hourly wage because it constitutes, in his belief, a more reasonable estimate of a person's work history. Dr. Moser agreed that his result would be similar to Dr. Bettinger's if he had used an hourly rate rather than average annual income.
Based on Walker's deposition testimony regarding his work history, Dr. Bettinger determined Walker's average hourly wage to be $8.50. Using 28.3 years as Walker's work life expectancy, Dr. Bettinger calculated Walker's present-value lost future earning capacity to be $408,907.00. A minimum wage offset of $247,720.00 was then subtracted from that figure leaving a balance of $161,187.00. Again using the $8.50 average hourly wage, Dr. Bettinger computed Walker's lost past earning capacity from the date of the accident up to the trial to be $31,679.00. Therefore, according to Dr. Bettinger, Walker's present-value lost past and future earning capacity equals $192,866.00.
Dr. Moser calculated Walker's average annual income for the three years preceding the accident to be $6,310.00. Using 24.45 years as Walker's work life expectancy, Dr. Moser calculated Walker's presentvalue lost future earning capacity to be $108,235.45. Determining the minimum wage offset to be $119,516.62, Dr. Moser testified that Walker did not have any lost future earning capacity. Again using Walker's average annual income, Dr. Moser computed Walker's lost past earning capacity to the date of trial to be $11,484.73. Therefore, according to Dr. Moser, Walker is only entitled to $11,484.73 for lost past and future earning capacity.
Diana Herpts, a vocational rehabilitationist, testified that Walker, with his disability, would be able to perform most of his past jobs.
Because lost earning capacity cannot be calculated with mathematical certainty, the trier of fact is afforded much discretion in the determination of such damages. However, the trier of fact must have a reasonable basis for its discretion and the record must contain a factual basis for such an award. Bailes v. U.S. Fidelity & Guar. Co., 512 So.2d 633 (La.App. 2d Cir.1987).
The jury could have accepted Dr. Moser's expert opinion. We cannot say that the jury abused its much discretion in awarding Walker $30,000.00 for this element of damage.

EVIDENTIARY RULINGS
Walker and Bankston assign as error numerous evidentiary rulings made by the trial judge.
The trial court has much discretion in controlling the conduct of the trial and the presentations of evidence. CCP Arts. 1631, 1632. Therefore, evidentiary rulings will not be disturbed absent a clear abuse of that discretion. After reviewing the alleged errors by the trial court in the light of the record, we find no reversible errors in this respect. The evidentiary assignments are without merit.

JURY INSTRUCTIONS
Both Walker and Bankston complain of the trial court's instructions to the jury.
*698 Even when requested instructions are fair statements of law, the trial court is not required to give the precise instructions submitted by the litigants as long as the court's instructions reflect the applicable law and adequately convey the issues to the jury. Jury instructions are adequate when they fairly and reasonably point up the issues and provide correct principles of the law for the jury to apply to those issues. Fuller v. U.S. Aircraft Ins. Group, 530 So.2d 1282 (La.App. 2d Cir. 1988), writ denied, U.S. cert. denied. Whether or not jury instructions are adequate is determined in light of the instructions as a whole. Creel v. S.A. Tarver & Son Tractor Co., 537 So.2d 752 (La.App. 1st Cir.1988).
Walker contends the trial court erred in failing to give his requested jury instruction regarding lost earning capacity in its entirety, and that the trial court's instruction was deficient in that it did not accurately represent the law on this issue. The requested instruction was a fair statement of the law. We also find, however, that the charge given by the trial court fairly stated the law and adequately instructed the jury on this item of damage. We append the two instructions as an unpublished addendum.
Bankston argues the trial court erred in refusing to give an instruction stating that law enforcement officials are allowed by law to disregard traffic laws when enforcing state laws.
A trial judge can properly refuse to give requested instructions which are misleading, not correct statements of the law, or are simply argumentative. Snow v. Gulf States Utilities Co., 492 So.2d 31 (La.App. 1st Cir.1986), writ denied. Bankston's requested instruction is misleading and incorrect insofar as it suggests that he was totally exempt from all traffic laws in this incident. See our earlier discussion. Having determined that neither LRS 32:395 nor LRS 32:24 excuses Bankston's duty, we find the trial court was correct in refusing to give Bankston's requested instruction.

COSTS
Walker complains that he was cast with 50 percent of costs and contends that Bankston should have been cast for all costs because Bankston was found to be obligated to pay damages to Walker in Walker's action.
The trial court may render judgment against any party for costs or part thereof as it considers equitable. CCP Art. 1920. The assessment of costs lies within the trial court's discretion and will not be reversed unless that discretion is abused. Johnson v. Hendrix Mfg. Co., Inc., 475 So.2d 103 (La.App. 2d Cir.1985).
In light of the allocation of fault, we cannot say that the trial court abused its discretion in casting costs 50 percent to each adverse litigant.

DECREE
We amend the trial court's judgment to increase the general damage award to $220,000. We assess costs of the appeal 50 percent to each of the adverse litigants. As amended, the judgment is
AFFIRMED.