655 So.2d 1381 (1995)
Elliott B. STONECIPHER, et al., Plaintiffs-Appellants,
v.
Kim E. MITCHELL, et al., Defendants-Appellants-Appellees.
No. 26575-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1995.
Rehearing Denied June 15, 1995.
*1383 Ronald D. Smith, Shreveport, for appellants.
Caldwell Roberts, Norman Lafargue, Brian Smith, Shreveport, for appellees.
Before MARVIN, HIGHTOWER and WILLIAMS, JJ.
WILLIAMS, Judge.
This is a suit for damages arising out of alleged breaches of contracts to design and to build a residence. Various parties appeal the trial court's decision. We amend in part and affirm as amended.

BACKGROUND SUMMARY
The plaintiffs are Elliott B. Stonecipher ("Stonecipher") and his wholly owned corporate business entity, Evets Management Services, Inc. ("Evets"). Evets financed construction of a house for Stonecipher. The defendants are architect Kim E. Mitchell, his firm, Morgan, Hill, Sutton & Mitchell, and his professional liability insurer, Design Professionals Insurance Co. ("Mitchell"); contractor James H. Joyner, Jr. and his construction company, Joyner Construction, Inc. ("Joyner")[1]; consulting engineer Rod Thientawach and his firm, NTB, Inc. ("Thientawach"); and the bonding company for Joyner Construction, Inc., Trinity Universal Insurance Co. ("Trinity").
Stonecipher contracted with Mitchell as the architect and Joyner as the contractor for the design and construction of a $200,000 residence on Cross Lake. Mitchell retained Thientawach as the consulting engineer. Construction began in late 1988 and was completed in the spring of 1989. Stonecipher was dissatisfied with the job and alleged various defects in the residence. Subsequent efforts to repair the house, arranged by Trinity under the performance bond, were also unsatisfactory to Stonecipher. Stonecipher and Evets sued for damages for faulty design and construction.
*1384 The case was tried to a jury in September and October of 1991. The jury rejected all of Evets' demands and rejected Stonecipher's demands against Thientawach. The jury found that Mitchell and Joyner had breached a duty owed to Stonecipher, and that Stonecipher's intellectual enjoyment was "the principal or exclusive purpose of any contract to build the residence." Further, the jury found that Mitchell or Joyner knew or should have known that intellectual enjoyment was Stonecipher's principal or exclusive purpose. Nonpecuniary damages of $25,000 were awarded to Stonecipher for loss of intellectual enjoyment. Pecuniary damages were assessed $26,500 against Mitchell and $100,000 against Joyner. Of the $100,000 assessed against Joyner, the jury determined that $76,000 was related to repair or replacement of the structure. The jury also found Trinity had not failed to pay a claim within thirty days after receipt of proof of loss and Trinity's actions were not arbitrary and capricious. Judgment was rendered in October 1991. We dismissed an earlier appeal in this case, in 1992, as premature.[2]
The trial court rendered an opinion and supplemental judgment on January 5, 1994, regarding solidary liability and expert witness fees. Mitchell filed a suspensive appeal. Stonecipher and Evets answered Mitchell's appeal and filed a devolutive appeal. Trinity answered the plaintiffs' appeal. Thientawach also responded to the plaintiffs' appeal. Mitchell, Trinity, and the plaintiffs assign various errors.

DISCUSSION
The trial court's factual findings are accorded great deference. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d 840 (La.1989). When a factfinder's determination is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be clearly wrong or manifestly erroneous. Rosell, supra.
NONPECUNIARY DAMAGES
On appeal, Mitchell argues that nonpecuniary damages are not available in suits arising from contracts to design and build a residence and, in the alternative, that Mitchell did not know and could not have known that Stonecipher's intellectual enjoyment was a primary cause of the contract. Stonecipher appeals the amount of the pecuniary damages, claiming that they are insufficient.
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss. LSA-C.C. Art. 1998. Thus, if the obligee can show that he intended to gratify a significant nonpecuniary interest by way of the contract, and the nature of the contract supports his contention, and that the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, then nonpecuniary damages may be recovered. See, Young v. Ford Motor Co., Inc., 595 So.2d 1123 (La.1992).
Counsel for Mitchell urges that Ostrowe v. Darensbourg, 377 So.2d 1201 (La.1979), stands for the proposition that nonpecuniary damages are not available in suits arising from a breach of contract to build a residence and that Ostrowe controls. We disagree. In Ostrowe the supreme court stated, "In the instant case we hold that the obvious inference to be drawn from the limited facts available in this record is that the principal object of the contract, as with most contracts to construct dwellings, was to build a structure to be used as a residence by the plaintiffs." *1385 Ostrowe, supra, at 1203. This language, in our opinion, clearly limits the holding to the facts of that case. We also note that the court in Ostrowe was interpreting LSA-C.C. Art. 1934, the predecessor of LSA-C.C. Art. 1998.[3] While the court in Ostrowe referred to the "principal object" of the contract, in light of the language of LSA-C.C. Art. 1998, we understand the current law to be that the obligee's nonpecuniary interest need only be a "significant" object or cause of the contract in order for nonpecuniary damages to be recoverable. Young, supra.
Whether the gratification of some nonpecuniary interest is the principal object of a contract is a question of fact. Johnston v. Norcondo, 572 So.2d 203 (La.App. 1st Cir. 1990), writ denied, 577 So.2d 13 (La.1991); Broom v. Leebron & Robinson Rent A Car, Inc., 626 So.2d 1212 (La.App. 2d Cir.1993). When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of those damages. LSA-C.C. Art. 1999.
Stonecipher testified that he wanted to live on Cross Lake because his positive memories of his father, from a difficult childhood, are associated with their fishing together on the lake. According to Stonecipher, both he and his father had dreamed of a house on Cross Lake. Stonecipher stated that he sought to reconcile with his deceased father by having his son, Ryan, live with him on Cross Lake. Stonecipher testified that he attempted to explain to "everyone involved in the project that it was not just a house." According to his testimony, he was not interested in the appearance of the house so much as "doing it right" and living on the lake with his son. However, Stonecipher testified that they planned the space and features of the house so that Ryan would have his space as he wanted it. He testified that he had saved money for sixteen years to build the house. Ryan Stonecipher's testimony supported that of his father. Ryan, age fourteen, testified that the house was important to his father "for sentimental reasons."
Mitchell testified that although he knew this was a "special house" and important to Stonecipher, he was unaware of all the underlying reasons behind Stonecipher's building on Cross Lake. Mitchell denied knowing that Stonecipher had saved for the house for sixteen years. Mitchell also testified that Stonecipher had told him that he, Stonecipher, may have to leave town at some point.
In the instant case, the trial judge instructed the jury using the older, stricter standard, i.e. whether the "principal or exclusive purpose" of any contract to build the residence in question was Stonecipher's intellectual enjoyment. The jury answered in the affirmative on this issue and further found that Mitchell or Joyner knew or should have known that intellectual enjoyment was the principal or exclusive purpose of the contracts. Certainly, if the jury could find Stonecipher's intellectual enjoyment to be the principal or exclusive purpose, the jury could have found it to be a significant purpose.
Our review of the record convinces us that Stonecipher had a significant nonpecuniary interest which he sought to fulfill by contracting for the design and construction of the house on the lake. Whether the obligors, Mitchell and Joyner, knew or should have known that breach would result in nonpecuniary loss to Stonecipher is a somewhat closer question. Although the record in the instant case is voluminous, there is relatively little evidence on this issue. However, after reviewing the record, we cannot say that the jury, which had the opportunity to observe and hear the witnesses, was clearly wrong in its determination that not only was Stonecipher's intellectual enjoyment the principal or exclusive purpose of any contract to build the *1386 residence, but also Mitchell or Joyner knew or should have known it.
The jury awarded $25,000 in nonpecuniary damages to Stonecipher. The trier of fact is given much discretion in awarding damages such as these, which by their nature are insusceptible of precise measurement. Having reviewed the record in its entirety, we find no abuse of discretion in the amount of this award. The verdict of the jury is affirmed as to the award of nonpecuniary damages.

SOLIDARY LIABILITY
Mitchell contends the trial court erred in finding the defendants solidarily liable and in failing to apportion the nonpecuniary damages among the defendants.
Solidary liability is not presumed. It arises from a clear expression of the parties' intent or from the law. LSA-C.C. Art. 1796; Yarbrough v. Federal Land Bank Ass'n, 616 So.2d 1327 (La.App. 2d Cir.1993). An obligation is solidary when each obligor is liable for the whole performance. LSA-C.C. Art. 1794. An obligation may be solidary though it derives from a different source for each obligor. LSA-C.C. Art. 1797. Solidary obligations may result, even though the parties are bound under separate contracts, if their respective breaches of their contracts combined and contributed to cause the same item of damages sustained by the plaintiff. Where the combined fault results in a loss for which defendants would be liable for the whole, the defendants' liability may be solidary. Rivnor Properties v. Herbert O'Donnell, Inc., 92-1103 (La.App. 5th Cir. 01/12/94), 633 So.2d 735, writ denied, 94-1293 (La. 09/02/94), 643 So.2d 147, citing Town of Winnsboro v. Barnard and Burk, Inc., 294 So.2d 867 (La.App. 2d Cir.1974), writ denied, 295 So.2d 445 (La.1974). It is the coextensiveness of the obligations for the same debt, and not the source of liability, which determines the solidarity of the obligation. Yarbrough, supra; Narcise v. Illinois Central Gulf R.R. Co., 427 So.2d 1192 (La.1983).
In the instant case, Stonecipher contracted with Mitchell as the architect and Joyner as the contractor for the house. The record reflects that Mitchell and Joyner contracted separately with Stonecipher and that their respective contracts had separate and distinct duties and obligations. There is no evidence that Mitchell and Joyner intended to be bound in solido. The obligations of Mitchell and Joyner pursuant to the contracts were several.[4] Mitchell and Joyner did not contract to do the same thing; each was obligated to do only what he promised to do. The jury in this case concluded that Mitchell and Joyner each breached a duty to Stonecipher. Mitchell's breach resulted in design defects in the house and Joyner's breach resulted in defects in the construction of the house. The breaches resulted in Stonecipher's suffering pecuniary damages. The jury assessed pecuniary damages of $26,500 against Mitchell and $100,000 against Joyner.
Mitchell's and Joyner's respective breaches of their contracts combined and contributed to cause the same item of damages sustained by Stonecipher. Specifically, the design defects and the construction defects combined and contributed to cause Stonecipher's loss of intellectual enjoyment. In this regard, Mitchell and Joyner are now obliged to the same thing; their obligation for Stonecipher's nonpecuniary damages is coextensive. Therefore, although we rely on somewhat different reasoning, we affirm the trial court's finding that Mitchell and Joyner are solidarily liable for Stonecipher's nonpecuniary damages.
Although the trial court found Mitchell and Joyner to be solidarily liable for Stonecipher's nonpecuniary damages, it failed to apportion fault between them. LSA-C.C. Art. 1804, regarding apportionment of liability between solidary obligors, provides in pertinent part:
Among solidary obligors, each is liable for his virile portion. If the obligation arises *1387 from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor.
In the instant case, both Mitchell and Joyner breached a duty growing out of contract, the duty to perform the contracts in a workmanlike manner as provided by the Civil Code.[5] Such breaches are considered "ex delicto" or arising from a quasi-offense. LSA-C.C. Art. 1804 necessitates that the trial court apportion fault in such cases. Nicholson & Loup, Inc. v. Carl E. Woodward, Inc., 596 So.2d 374 (La.App. 4th Cir.1992), writ denied, 605 So.2d 1098 (La.1992).
Assuming that the fault of Mitchell and Joyner for Stonecipher's nonpecuniary damages lies in the same proportion as their fault for his pecuniary damages, as inferred from the pecuniary damages awarded by the jury, Mitchell is 21% at fault and Joyner is 79% at fault.[6] However, liability for damages is solidary only to the extent necessary for Stonecipher to recover from Mitchell fifty percent of his nonpecuniary damages, pursuant to LSA-C.C. Art. 2324(B).

PECUNIARY DAMAGES
On appeal, Stonecipher urges that the pecuniary damages award ($26,500 against Mitchell and $100,000 against Joyner) is inadequate and should be increased. Stonecipher also argues that the division of the $100,000 award against Joyner so as to assess $76,000 of that award against Trinity was error and Trinity should be liable for the entire amount assessed against Joyner. Trinity also contends that the division is erroneous. However, Trinity argues that the $76,000 assessment for repair of the house is excessive and the amount for which it is liable should be no more than $15,000.
In addition to various fact witnesses, the plaintiffs presented the following expert witnesses at trial: William Owen Hadley, civil engineer; Victor Pavloff, Jr., civil engineer; Thomas F. Gibson, contractor; Mike Harris, expert in foundation underpinning; and, Hymen Turpin, architect. The defendants, in addition to their various fact witnesses, presented the testimony of the following experts: W.J. Evans, civil engineer and architect; Lewis J. Capozzoli, civil engineer; Robert Dwayne Fenner, civil engineer; and, Rand Knicely, architect and contractor.
The record indicates the primary areas of contention involve the foundation, the roof structure, cracks in the brick exterior, drainage of the lot, and stability of the boathouse. Each of the various experts testified as to his observations, any tests or measurements he had done, his opinion as to the cause of the problems with the house, and his opinion as to what would be required to correct the problems. Hadley, testifying for the plaintiffs, opined that it is impractical to try to repair the foundation and that the remedy for the problems of the house would be to tear the house down and start from the ground up. According to Hadley, the foundation was built as designed. He predicted that the problems will worsen as the house settles. Hadley further testified that the house is dangerous because it is not a stable structural configuration. He indicated that because of concern about high winds at the lake location, he would not live in the house.
Pavloff opined that there were some design flaws in the house as well as "blatant *1388 disregard of the plans and specifications." Specifically, he testified that the boathouse was not built in accordance with the plans and it is not stable. Pavloff further opined that the foundation cannot be repaired. According to Pavloff, the foundation was not built as designed. Also testifying on behalf of the plaintiffs, Gibson stated that as a contractor he would not warrant repairs to the house. Gibson indicated that he would warrant the construction only if the house were torn down and he started construction anew. He estimated the cost to demolish, remove the debris and reconstruct the house, with warranty, at $253,872. Gibson's estimate to replace the boathouse was $48,200.
Harris testified that although the foundation could be underpinned, he did not believe it would be effective to repair the foundation. Turpin, also testifying for the plaintiffs, opined that the architect should have either placed the house on the lot such that water would drain properly or contoured the site to achieve proper drainage. He further testified that in the construction of the house there were several variations from the plans. Turpin indicated that he would advise Stonecipher to start over with the house.
Testifying for the defense, Capozzoli stated that he found the house unusually level and that any settling that has occurred is less than average and well within normal construction tolerances. He opined that the foundation is structurally sound and that nothing needs to be done to it. He testified that the cracks in the brick exterior are not related to settlement or weakness of the foundation. In regard to the various exterior cracks, Capozzoli recommended two repair approaches: caulking with a matching plastic mortar, or putting control joints in the facade where the cracks occurred.
Evans, testifying for the defense, stated that he found "no justification for the position that the house is dangerous and should be abandoned." Evans opined that the roof structure is "a very reliable system" and that there is nothing about it that renders it unsound. He expressed concern, however, as to whether the load capacity as related to the attic storage room meets standards. He then diagramed for the jury his recommendation for adding two by fours so as to equalize the load across ceiling joists and for reinforcing a support beam beneath the joists. Evans testified that he would remedy the cracks in the exterior by creating control joints in the brick walls. Evans stated that he found no sign that the window columns are bowed or distressed, as alleged by the plaintiffs. He indicated that, assuming the columns are built as designed, they are structurally sound; if they are not built as designed, he would recommend reinforcing the columns. Evans further testified that where the architect's plans call for a drainage swell, a sidewalk was built and the grade of the walk is such that water drains into the garage. He opined that the solution is to change the grade of the walk so that water on the walk is always below the garage floor level, or to remove the walk and use the open earthwork. According to Evans, the boathouse is not unsafe, but should be cross-braced. He provided estimates, totalling a maximum of $11,700, for the various repairs he discussed.[7]
Fenner also testified that the house does not need to be torn down and rebuilt. He indicated that although some repairs, including venting the storage area under the patio, are needed, the house is sound. Fenner opined that the foundation needs no repairs. Knicely, also testifying for the defense, provided cost estimates, totalling a maximum of $17,000 for various repairs.[8] He opined that the slab of the house is structurally sound and that neither the house nor the boathouse is unsafe. While he did not testify that the *1389 boathouse should be rebuilt, Knicely indicated that if it were done, it should cost no more than $20,000.
Additionally, Stonecipher testified to and introduced evidence regarding various other pecuniary damages he suffered as a result of the breaches of duty regarding the design and the construction of the house. These claims, which by our calculations totalled in excess of $400,000, included damages such as lost income, rent and moving expenses, and expenses incurred in attempting to correct the landscaping problems.
Obviously, the jury did not fully accept the testimony of either Stonecipher and the plaintiffs' expert witnesses or the defendants and their expert witnesses. The jury did not find, as the plaintiffs had urged, that it was necessary to demolish and rebuild the house. Nor, apparently, did the jury find that necessary repairs of the house could be adequately accomplished so readily and inexpensively as urged by the defendants. Such determinations are factual findings and are subject to the manifest error rule. Nicholson & Loup, supra. After a review of the record in its entirety, we conclude that the jury could have reasonably believed that the plaintiffs' witnesses tended to exaggerate and the defendants' witnesses tended to minimize the problems with the house. We believe that the jury attempted, and achieved, substantial justice in its awards to Stonecipher. We cannot say that the jury, which had the opportunity to hear, observe, and assess the credibility of the witnesses, was clearly wrong or abused its discretion in awarding $26,500 against Mitchell and $100,000 against Joyner for pecuniary damages. Accordingly, we affirm as to the amounts of the pecuniary damage awards.
A suretyship is an accessory contract by which a party binds himself to a creditor to fulfill the obligation of another if the latter fails to do so. LSA-C.C. Art. 3035. A contractor's surety bonds are either "performance bonds," which guarantee that the contractor will perform the contract, or "labor and material payment bonds," which guarantee that all bills for labor and materials contracted for and used by the contractor will be paid by the surety if the contractor defaults. Bossier Medical Properties v. Abbott and Williams Construction Co. of Louisiana, Inc., 557 So.2d 1131 (La.App. 2d Cir. 1990). A suretyship may be qualified, conditioned, or limited in any lawful manner. LSA-C.C. Art. 3040. The surety promises to satisfy the entire obligation, unless the agreement is otherwise limited. Obligations set forth in a bond given by a compensated surety are strictly construed in favor of protecting the obligee. Bossier Medical, supra.
In the instant case, Trinity is the surety for Joyner. The record reflects that both a performance bond and a labor and material payment bond, each in the amount of $200,000, were issued in favor of Stonecipher. The performance bond reads, in pertinent part:
Now, therefore, the condition of this obligation is such that, if Contractor shall promptly and faithfully perform said Contract, then this obligation shall be null and void; other-wise it shall remain in full force and effect....
Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly
1) Complete the Contract in accordance with its terms and conditions, or
2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or, if the Owner elects, upon determination by the Owner and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Owner, and make available as Work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the *1390 cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof....
(Emphasis added.) Trinity argues, based on the language cited above, that it is obligated only to perform in place of the contractor and can be assessed only the cost of repairs. The jury verdict form requested the jury to specify what portion of any pecuniary damages assessed against Joyner were related to repair or replacement of the structure. The judgment rendered in the case provides that Trinity is liable, in solido, with Joyner for the $76,000 related to repair or replacement of the structure. One hundred thousand dollars ($100,000) was assessed against Joyner for pecuniary damages. However, in reviewing the record, we are unable to locate any stipulation or finding that Trinity's liability is limited to the cost of repair or replacement of the structure and neither party arguing this issue refers us to such.
We do not read the language of the performance bond to limit Trinity's liability to costs of repair or replacement of the structure. The language of the bond indicates that the surety is released from liability on the bond if the contractor "promptly and faithfully" performs the contract. Furthermore, the language of the bond indicates the surety contemplated potential liability for "other costs and damages" in addition to costs of completion. We construe the language strictly in favor of protecting the obligee. Although Trinity could have limited its liability under the provisions of the surety agreement to costs of repairs or replacement, it did not do so in the instant case. Accordingly, we find that it was error to have limited Trinity's liability to the $76,000 for cost of repairs. The judgment is amended to reflect that Trinity is liable, in solido, with Joyner for the full amount of pecuniary damages assessed against Joyner.

EVETS' CLAIMS
The plaintiffs argue that the claims of Evets were erroneously dismissed. Evets, a corporate entity, is separate from Stonecipher, although wholly owned by Stonecipher. Evets' involvement in the design and construction of the house was limited to providing Stonecipher with the financing to pay for the residence. Stonecipher personally contracted with Mitchell for the design and with Joyner for the construction of the residence.
Trinity issued a performance bond and a labor and material payment bond based on Stonecipher's contract with Joyner. The bonds identify Stonecipher as the sole obligee. The language of the performance bond clearly limits right of action on the bond to Stonecipher or his heirs, executors, administrators or successors. By order signed September 24, 1991, the trial court dismissed all claims by Evets against Trinity. We find no error in that dismissal. Evets' claims against the other defendants went to the jury for determination. The jury found that none of the defendants, including Joyner, for whom Trinity was the surety, breached a duty to Evets. After review of the evidence, we find that the jury's verdict in this regard is well supported by the record. We cannot say that the jury was clearly wrong or manifestly erroneous in this finding. Evets' claims were properly denied.

EVIDENTIARY AND PROCEDURAL ISSUES
The plaintiffs argue various errors related to evidentiary or procedural issues. We have reviewed each assignment of error and find each to lack merit and to warrant only limited discussion. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and when the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel. LSA-C.E. Art. 103(A)(2).
The plaintiffs complain that evidence as to the lack of existence and/or invalidity of the performance and the labor and material payment bonds for the construction project was erroneously excluded *1391 at trial. The record reflects that in the pre-trial order, filed September 12, 1991, the parties stipulated that in connection with the construction contract, a performance bond in the amount of $200,000 and a labor and material payment bond in the amount of $200,000 were executed by Joyner Construction Company, Inc. and Trinity Universal Insurance Company. A stipulation has the effect of binding all parties and the court. Harris v. West Carroll Parish School Board, 605 So.2d 610 (La.App. 2d Cir.1992), writ denied, 609 So.2d 255 (La.1992).
As we understand the plaintiffs' argument, they now complain that in stipulating to the bonds, they relied to their detriment on representations of attorneys for the defendants that "signed" bonds would be produced at trial. The plaintiffs contend that because of the stipulation, they were prevented from further discovery regarding possible irregularities in the bonding process. Providing no references to the record and citing to no law, they further argue that valid bonds were a suspensive condition of the construction contract and that they have been denied an opportunity to assert an additional cause of action for rescission of the construction contract. The record reveals that copies of the bonds, signed by an agent for Trinity, although not signed by Joyner Construction Co., Inc., were introduced into evidence at trial. We find no indication in the record that Trinity, the party bound by the bonds as surety for Joyner, challenged the existence or validity of the bonds. The plaintiffs, as well as the other parties and the court, are bound by the stipulations in the case, even if they acted imprudently in entering into these stipulations.
Furthermore, it is not apparent, and plaintiffs' counsel was unable to clarify at oral argument, how the plaintiffs may benefit by demonstrating that the surety bonds were non-existent or invalid.[9] The plaintiffs do not specify what evidence was erroneously excluded nor do they refer us to the record for the trial court's action or any proffer of evidence. We do not see that the plaintiffs were prejudiced by any exclusion of evidence related to the alleged non-existence or invalidity of the surety bonds. This assignment of error is disingenuous and without merit.
The plaintiffs contend that Stonecipher's testimony was erroneously terminated. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to avoid needless consumption of time. LSA-C.E. Art. 611(A). The trial judge has great discretion in the manner in which proceedings are conducted before his court, and it is only upon a gross abuse of that discretion that appellate courts intervene. Harris, supra. After reviewing Stonecipher's testimony, we do not find that his testimony was improperly terminated. In the specific portions of the testimony about which the plaintiffs complain, the trial court sustained objections by defense counsel because Stonecipher was arguing his case to the jury from the witness stand and because questions on direct were leading and repetitive. We find no abuse of discretion in these evidentiary rulings by the trial court. This assignment of error lacks merit.
The plaintiffs assert that evidence as to the connection between the Stonecipher's construction project and McAdoo Limited Partnership was erroneously excluded. The plaintiffs complain that they are prejudiced because the Notice of Contract recorded in the public records of Caddo Parish erroneously bore the heading "McAdoo Limited Partnership." A copy of the notice, signed by Stonecipher and Joyner, was introduced into evidence by Mitchell. The record reflects that both defendants Mitchell and Joyner were questioned extensively by plaintiffs' counsel regarding the McAdoo Limited Partnership and any relationship it may have had with Stonecipher's construction project.
*1392 The plaintiffs neither identify the evidence they claim was erroneously excluded nor cite us to the record for trial court actions or proffer of evidence. We fail to find that any substantial right of the plaintiffs has been affected. This assignment of error is without merit.
The plaintiffs complain that evidence supporting their entitlement to an award of attorneys' fees under LSA-R.S. 22:658 was erroneously excluded. Specifically, the plaintiffs claim that the trial court erroneously excluded a demand letter from previous counsel because it was not listed on the Pre-trial Order. However, the document is neither identified or described by the plaintiffs, nor are we cited to the record for support of their argument.[10] The orderly administration of justice requires procedures and limitations such as those provided in a court's pre-trial order. We note in reviewing the record that the trial judge quite consistently excluded from evidence items which were not listed in the pre-trial order. The trial judge has great discretion in the manner in which proceedings are conducted before his court, and it is only upon a showing of a gross abuse of that discretion that appellate courts intervene. Harris, supra. The plaintiffs have shown no abuse of discretion or evidentiary error by this assignment. This assignment of error lacks merit.
The plaintiffs argue that evidence was erroneously excluded in that the jury was not permitted to view and inspect the residence. The record reflects that the plaintiffs opposed the defendants' request to have the jury view the house; thus, they should not be heard to complain. Nevertheless, we note that in denying the request to allow the jury to visit the house, the trial judge stated that although his initial inclination had been to allow such a visit, as the trial progressed it became apparent that to do so would have been a comment on the safety or nonsafety of the house. We see no abuse of discretion in the trial court's ruling on this matter. This assignment of error is disingenuous and without merit.
The plaintiffs contend that evidence which would have allowed the jury to award damages for arbitrary and capricious behavior under the provisions of LSA-R.S. 22:1220 was erroneously excluded. Again, the plaintiffs fail to identify or describe the evidence they allege was erroneously excluded and to cite to the record for trial court actions or proffer of evidence. In addition, the brief statement regarding this assignment of error does not provide sufficient information to facilitate review. In that this assignment of error is not referenced to the record and is not briefed, we consider it abandoned. Pursuant to Uniform Rules Courts of Appeal, Rule 2-12.4, we do not address this assignment of error further.
The plaintiffs further assert that evidence produced during post-trial discovery ordered by the trial court should be considered by the court of appeal, or, if the case is remanded, at the new trial. An appellate court may not consider evidence which is not part of the record, nor can it receive evidence to supplement the record. Barnett v. Barnett, 477 So.2d 1289 (La.App. 3d Cir.1985). Although ordinarily appellate courts may not receive new evidence, an exception to the rule has been recognized where the facts subsequent to trial are not disputed and are admitted. Tebbe v. Avegno, 435 So.2d 513 (La.App. 4th Cir.1983), writ not considered, 441 So.2d 753 (La.1983). In the instant case, however, there has been no joint stipulation of facts. Therefore, the documents obtained during post-trial discovery do not properly form a portion of the record lodged in this court and we decline to review them.

LITIGATION EXPENSES
The plaintiffs complain that the judgments of the trial court are in error in *1393 that they failed to award specific recovery of necessary litigation expenses of the plaintiffs in the amount of $7,517.22. The plaintiffs contend these expenses, for such as preparation of exhibits, were "required." Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. LSA-C.C.P. Art. 1920. The assessment of costs lies within the discretion of the trial court and will not be reversed unless that discretion is abused. Walker v. Bankston, 571 So.2d 690 (La.App. 2d Cir.1990). We note that the plaintiff did not fully prevail in the instant case and that all costs of court were assessed against the defendants. Having reviewed the record, we cannot say that the trial court acted inequitably or abused its discretion in choosing not to tax this portion of the plaintiffs' expenditures as costs. This assignment of error lacks merit.
EXPERT WITNESS FEES
The plaintiffs complain that the judgment was erroneous in that it failed to award the full amount of $32,795.54 for expert witness fees. Trinity argues that the trial court's award for expert witness fees is not based on competent evidence, is excessive and should be reduced to a maximum of $7,000. The record reflects that the trial court awarded a total of $22,000 for expert witness fees. The testimony of the experts for whom the trial court awarded fees spanned some three days of trial and comprises approximately two volumes of the record. Addressing expert witness fees, the trial court indicated the fee awards were "... based on the court's observation of the experts' time at trial, effort, attentiveness to detail and helpfulness and necessity, and keeping in mind that this was an extremely complicated case with practically each and every position of the parties being hotly contested and that opposing expert testimony was presented for the jury to weigh ..."
LSA-R.S. 13:3666 provides for expert witness fees to be fixed by the court and states in pertinent part:
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) from the testimony adduced upon the trial of the cause, the court shall determine the amount thereof and include same or,
(2) by rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.
LSA-R.S. 13:3666(B). Under LSA-R.S. 13:3666 and LSA-C.C.P. Art. 1920, the trial court has great discretion in awarding expert witness fees. Reviewing courts will not disturb the award in the absence abuse of discretion. The trial court is not required to set an expert fee at the amount charged by the expert witness. Stephens v. Town of Jonesboro, 25,715 (La.App. 2d Cir. 08/19/94), 642 So.2d 274, writ denied, 94-2557 (La. 11/29/94), 646 So.2d 400.
The minutes of the court in the instant case indicate that a rule to fix costs and expert witness fees was argued and the plaintiffs were ordered to submit an itemized costs list within 10 days. The defendant was given 10 days to respond. The record includes costs lists and affidavits of expert witnesses as subsequently submitted by the plaintiffs. We do not find before us a transcript of the rule to show cause. Trinity complains that the costs lists and affidavits are not competent evidence because they were not introduced into evidence, but merely filed into the record. Based on the information before us, we do not know if Trinity made its evidentiary objection known, either at the argument on the rule or within the 10-day period provided for the defense to respond.
Further, we do not know to what extent, if any, the trial court relied on the lists and affidavits filed by the plaintiffs. The language in the trial court's opinion indicates *1394 the fees were based on its observations and other considerations about the nature of the trial. We note, too, that at trial there was ample testimony, which would have aided the trial court in determining expert witness fees.[11]
Neither the plaintiffs nor Trinity has demonstrated to our satisfaction any abuse of the trial court's broad discretion in awarding expert fees. The trial court's award of $22,000 for expert witness fees is affirmed.

AMOUNTS ON DEPOSIT
The plaintiffs complain that the amounts deposited in the registry of the trial court are incorrect and inadequate to satisfy the judgments. In reviewing the record, we find no indication that the plaintiffs challenged in the trial court, the accuracy or sufficiency of such deposits. Because the plaintiffs raised no objection below, we do not find this matter to be properly before us. If, by this assignment, the plaintiffs seek to challenge the validity or sufficiency of the posted appeal bond, the proper forum is the trial court. La.C.C.P. Art. 2088. This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to apportion the fault and liability of Mitchell and Joyner for nonpecuniary damages; we determine that Mitchell is 21 percent at fault and Joyner is 79 percent at fault. The judgment is further amended to reflect that Trinity is liable, in solido, with Joyner for the full amount of pecuniary damages assessed against Joyner. Otherwise, the judgment of the trial court is affirmed.
Costs of this appeal are assessed 1/3 to Elliott B. Stonecipher and Evets Management Services, Inc., 1/3 to Kim E. Mitchell, Morgan, Hill, Sutton & Mitchell, and Design Professionals Insurance Company, and 1/3 to Trinity Universal Insurance Company.
AMENDED AND AFFIRMED AS AMENDED.

APPLICATION FOR REHEARING
Before MARVIN, LINDSAY, HIGHTOWER, BROWN and WILLIAMS, JJ.
Rehearing denied.
NOTES
[1] Initially, Dan Joyner, an employee of Joyner Construction Co., was named a defendant in this action. However, according to the minutes of the court, a motion for summary judgment was granted in his favor, dismissing the plaintiffs' claims against him. Also, the trial court granted a directed verdict in favor of James H. Joyner, Jr., citing insufficient evidence to pierce the corporate veil and ruling that Evets and Stonecipher have no claim against him personally. Neither of these rulings is challenged on appeal.
[2] Stonecipher v. Mitchell, 24,363 (La.App. 2d Cir. 07/16/92) (appeal dismissed).
[3] Louisiana jurisprudence regarding nonpecuniary damages and the interpretations of LSA-C.C. Art. 1934 and its successor, LSA-C.C. Art. 1998, enacted in 1984, have been much discussed. See, Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La.1976); Lafleur v. John Deere Co., 491 So.2d 624 (La.1986); Gary P. Graphia, Comment, Nonpecuniary Damages: A Guide to Damage Awards Under Louisiana Civil Code Article 1998, 50 La.L.Rev. 797 (1990).
[4] LSA-C.C. Art. 1787 provides in pertinent part: "When each of different obligors owes a separate performance to one obligee, the obligation is several for the obligors."
[5] LSA-C.C. Art. 2769 provides: If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.

LSA-C.C. Art. 2762 provides: If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.
[6] The jury awarded a total of $126,000 in pecuniary damages, assessing $26,500 against Mitchell and $100,000 against Joyner. Rounded to the nearest whole number, Mitchell's portion is 21% of the total and Joyner's portion is 79% of the total.
[7] Distributing attic load$2250; control joints $1600; bracing boathouse$500; reinforcement of columns (if not built to design)$6250; and, sidewalk (if replaced)about $1100.
[8] Reinforcement of columns$3200; replace sidewalk$1600; leaking shower$ 1300; boathouse handrails$100; boathouse bracing $300-$800; cracked brick exterior$3200; sheetrock cracks$1800; and, patio repairs $200-$5000.
[9] As we understand the case, if the surety bonds were non-existent or invalid, Trinity would have no liability; if the plaintiffs were to pursue and prevail on an action for rescission of the construction contract, they would be left with only Joyner from whom to collect any judgment; and, as the plaintiffs were aware, Joyner had become bankrupt.
[10] We note that in a brief filed by one of the defendants, opposing counsel presumes the identity of the document and attempts to make a correction in plaintiffs' assignment of error before proceeding to respond. While that may be a prudent course of action on the part of opposing counsel, we decline to take such a course.
[11] The witnesses were questioned as to credentials and experience prior to being accepted as experts. Additionally, the various experts testified to the number of visits they made to the house, preparation of reports or exhibits, review of other experts' reports or depositions, and, one expert testified to the hourly fee he normally charged.