772 So.2d 938 (2000)
NATIONAL BUILDING & CONTRACTING CO., INC., et al.
v.
ALERION BANK & TRUST COMPANY.
No. 99-CA-2561.
Court of Appeal of Louisiana, Fourth Circuit.
November 8, 2000.
Rehearing Denied December 15, 2000.
*939 Lynn H. Frank, Joseph R. Ward, Jr., Ward, Nelson & Pelleteri, LLC, New Orleans, Louisiana, James S. Holliday, Jr., James S. Holliday, Jr., A.P.L.C., Baton Rouge, Louisiana, Attorneys for Plaintiff/Appellees.
Alan D. Ezkovich, Glen E. Mercer, Sessions & Fishman, New Orleans, Louisiana, *940 James F. Willeford, New Orleans, Louisiana, Attorneys for Defendant/Appellants.
Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge PHILIP C. CIACCIO, Pro Tem.
McKAY, Judge.
This case involves the Tchefuncte Harbour Townhomes project in St. Tammany Parish. The project's former owner had gone bankrupt and the project had been abandoned for several years. At some time in the late 1980's, Nick Popich (Popich), the owner of Dibidale of Louisiana, Inc. (Dibidale) became interested in the unfinished project. Mr. Popich met with Wil Whitmore, president, CEO, and chairman of the board of American Bank and Trust (ABT) to discuss financing the project. Mr. Popich also met with Ronnie Theriot, the owner of National Building and Contracting Company (NBC) to discuss construction costs and vision of the project. Mr. Theriot visited the project site numerous times, taking with him architects, engineers, sub-contractors, and craftsmen, to determine whether the project was technically and economically feasible. Mr. Theriot initially put in a bid on the project of 5.3 million dollars based on the understanding that NBC would assume the risk of latent defects. A second bid of 4 million was also submitted. Finally, after consultation with Mr. Popich's representatives, Mr. Theriot submitted a bid of 4 million dollars with the understanding that the owner would bear the risk of any latent defects. This bid was accepted.
On September 2, 1987, Mr. Popich negotiated a loan with ABT for 6.5 million dollars in order to acquire the property from the FSLIC as well as cover the costs of construction. At the same time that the loan documents were signed, Leonard Spangenberg, Mr. Popich's architect and agent, signed a construction contract with NBC. The loan documents contemplated that the bank would disburse the construction money through 2-party checks made payable to the contractor and its vendors.[1] Although the construction contract contemplated that the guaranteed maximum cost of the project would be $4,000,000, the contract also provided that the cost "shall be increased or decreased for changes in the work." The contract further provided that "the contractor shall be reimbursed on the basis of cost of the work."
Work on the project began on September 3, 1987. NBC brought in its own carpenters and craftsmen from Houma who lived on site in some of the unfinished units.[2] Spangenberg moved onto the project site into the same unit occupied by Theriot and supervised all phases of the work very closely. Mr. Spangenberg embellished and expanded the scope of the project. Spangenberg understood that Theriot was keeping records of the work and would reduce the change order to writing at a later time. Theriot reduced his proposal to writing; he and Spangenberg then reviewed it, negotiated prices and scope, and ultimately signed the final version for $873,766 on February 18, 1988. Even after the first change order was signed, Spangenberg continued to order modifications, embellishments, and additions to the plans. However, only after Spangenberg, Oscar Hardison, Dibidale's comptroller, and Robert Blanchard, the bank's inspector, were satisfied did the bank release any money from the account.
In February of 1988, money problems began to affect the project; Dibidale was unable to make full payments for the work completed. On February 17, 1988, NBC submitted an application for payment in *941 the amount of $750,160, but Dibidale was only able to pay approximately $250,000. Theriot was assured by Hardison and Spangenberg that Dibidale would obtain more money either from the bank or from some of Popich's outside sources. However, the months of March and April passed and the promised additional funding never materialized. Dibidale was barely paying NBC enough to meet its payroll and NBC was ready to stop work on the project. At this point, the bank stepped in and asked NBC to attend a meeting with itself and Dibidale to determine what could be done to finish the project.
The meeting, at which the amount needed to complete the project was discussed, took place on May 4, 1988. Present at the meeting were Wil Whitmore, Popich, Theriot, Hardison, and Allen Frederic, the senior ABT loan officer. Whitmore wanted to know what the outstanding payables were and what amount would be needed to complete construction. Based on the figures given to him by Theriot and Hardison, Whitmore determined that it would take somewhat more than 1.4 million dollars in construction costs to complete the project in the scope that was contemplated on the date of the meeting. Theriot said that NBC would perform the work for 1.4 million if the bank would lend that amount to Dibidale. Those present at the meeting understood that the proceeds of this loan would be solely dedicated to hard construction costs. The loan application for 1.4 million dollars was prepared on May 4 1988, and the loan closing was set for May 11, 1988. The loan application stated that "[t]he new loan will be in the amount of $1,400,000 and funds will be advanced to cover hard construction costs only."
Peter Butler, a bank officer as well as Dibidale and Popich's attorney at the time, drafted a three-party letter agreement to memorialize the agreements reached by Whitmore, Popich, and Theriot. The agreement stated that NBC's consideration for continuing to work on the project included the bank's "new loan to Dibidale in the amount of $1,400,000 over and above any funds previously advanced by [the bank] for the purpose of completing the Improvements at Tchefuncte Harbour and (b) establishment of an escrow account in the amount of $500,000 pursuant to the Second Loan Agreement." The agreement goes on to state that the "sum of $900,000 of the $1,400,000 Construction Loan shall be advanced by Lender to Borrower... in connection with the completion of construction of the Improvements." The agreement further provided that the balance of the construction loan "shall be deposited into an escrow account with the Lender, which escrowed amount shall constitute a retainage fund for any unpaid laborers and materialmen who could file liens against the Property and the Improvements." Finally, the agreement provided that the escrowed amount could not be released by the bank without "the written agreement of Borrower, Contractor, Architect, and bank's project inspector."
Based on the assurances given in the three-party agreement, NBC continued to work on the project. Between May 11 and June 3, NBC received $602,180.32 for subcontractors, materials, and labor. However, unbeknownst to NBC, the bank also used proceeds from the loan to pay for costs other than for hard construction. On May 12, 1988, the bank paid itself $14,000 in closing costs as well as $68,039.95 on a Dibidale interim note. On June 3, 1988, the bank paid $20,000 to the law firm of Sessions & Fishman to pay costs of a quitclaim deed, $16,519.73 in property taxes, and $169,360.23 to itself for interest on the first $6,500,000 loan.[3]
By the beginning of June, payments to NBC had again slowed. On June 1, 1988, NBC and Dibidale signed an agreement which authorized the bank to release funds from the $500,000 held in escrow "provided that said amount(s) are in payment of any *942 improvements for the project referred to therein including payroll costs, subcontractor costs, and material costs, which expenditures are authorized in accordance with the construction contract." Despite the clear language of this agreement, the entire escrowed amount ($127,656.04 on June 8, 1988; $222,343.96 on June 28, 1988; and $150,000 on July 12, 1988) was simply deposited into Dibidale's operating account.
On June 9, 1988, NBC received $127,656.04 directly from Dibidale's operating account and not from the bank in the form of two-party checks as it was accustomed. NBC mistakenly believed that these funds had come from Popich's outside sources and therefore was encouraged to undertake upgrades and additional work ordered by Spangenberg. However, by June 23, 1988, Dibidale had again fallen behind on its payments to NBC. This lead NBC to seek out of the project. On June 23, 1988, NBC and Dibidale signed an agreement whereby NBC would stop working on the project and stop incurring new debt but forfeit none of its rights under the various contracts and agreements. The June 23, 1988 agreement, which was strictly between NBC and Dibidale, further provided that Dibidale would not spend in excess of $350,000 to complete the project "in accordance with the construction contract and letter agreement [of May 11, 1988]."
Although NBC stopped working on the project, it did not completely abandon Dibidale Theriot urged his subcontractors and suppliers to continue working for Dibidale. Theriot also agreed that work would continue under NBC's contractor's license and that his workers would continue to furnish the labor. It was understood that any work requested by Dibidale was its responsibility and the funds to pay for it would not come out of NBC's retainage. However, Dibidale did in fact spend NBC's retainage for this work.
On June 2, 1988, NBC presented an invoice to Dibidale for unpaid bills. This amounted to $1,138,909 in actual invoices, $460,282 in contractor overhead and profit, as well as additional anticipated invoices in the amount of $298,300. Dibidale ignored this invoice and more than $811,974.33 in liens were filed because NBC could not pay all of the subcontractors and suppliers. Eventually, the bank decided to foreclose on the property and erase all liens. After foreclosure and the sheriff's sale, the bank acquired Tchefuncte Harbour Townhomes. The bank sold Popich the option to purchase the property. Popich in turn assigned the option to Asean Homes, another corporation that he owned. In the meantime, Dibidale had gone into bankruptcy. Ultimately, Popich acquired the property, the bank recouped its money, and NBC was ruined.
NBC filed suit against Dibidale and ABT for the damages it sustained as a result of their actions. In response, the defendants filed several reconventional demands against NBC. The trial court ruled for NBC and awarded it $1,524,154 in damages. The trial court rejected the defendants' reconventional demands finding that they "were primarily responsible" for any damages that they may have sustained. It is from this judgment that the defendants now appeal. The defendants have also filed exceptions of no cause of action and prescription.
At issue in this appeal is whether the trial court erred in awarding NBC $1,524,154.00 in damages; whether the trial court erred in finding Dibidale and ABT to be solidarily liable; whether the trial court erred in finding that Dibidale and ABT were in bad faith; and whether the trial court erred in not granting the defendants' reconventional demands against NBC and Theriot.
A court of appeal may not set aside a trial court's or a jury's finding of fact in absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). The appellate court must determine not *943 whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one, after reviewing the record in its entirety. Mart v. Hill, 505 So.2d 1120 (La.1987); Rosell, 549 So.2d 840; Stobart, 617 So.2d 880. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, 549 So.2d 840; Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Stobart, 617 So.2d 880.
The trial court found that everyone at the meeting of May 4, 1988 agreed and understood that all proceeds from the new loan would be dedicated to hard construction costs.[4] However, some of the proceeds from the second loan were used to pay interest owed to the bank on the first loan and other non-construction costs. The bank argues that of the proceeds from the $1.4 million loan, only the retainage amount of $500,000 was dedicated to construction costs. Based on the evidence in the record, such as the testimony of Theriot, Whitmore, and Butler as well as the second loan application, which stated: "funds will be advanced to cover hard construction costs only," this does not appear to be the case.
Although the bank maintained that only the retainage amount of $500,000 was dedicated to construction costs, the bank turned over the $500,000 retainage account to Dibidale to use without restriction. Paragraph 4 of the May 11, 1988 agreement states that the bank shall release none of the escrowed amount unless such release is "pursuant to the terms of the Second Loan Agreement or in response to a final judgment of a court of competent jurisdiction." By releasing the escrowed amount to Dibidale, the bank clearly breached its fiduciary duty to NBC. Courts in this state have held that where a financial institution acts as a fiduciary and violates an escrow agreement, it is liable to make restitution and pay for all damages that are proximately caused by the violation. MacKendree v. Commercial National Bank, 340 So.2d 1080 (La.App. 1 Cir. 1976); Primus v. Feazel, 189 La. 932, 181 So. 449 (1938). Furthermore, in a case with a factual situation similar to the instant case, the Third Circuit held that a bank breached its fiduciary duty to a customer when it used improperly disbursed money from an escrow account, created by a three party agreement, at the direction of the other customer. Breaux v. Daigle, 571 So.2d 231 (La.App. 3 Cir.1990).
The trial court also found that ABT and Dibidale were obligors in bad faith and were therefore liable for all damages foreseeable or not that were a direct consequence of their failure to perform under the agreements with NBC. Bad faith has been defined as "a designed breach of [contract] from some motive of interest or ill will." Williams v. Coe, 417 So.2d 426, 430 (La.App. 1 Cir.1982); Delaney v. Whitney Nat. Bank, 96-2144, 97-0254 (La.App. 4 Cir. 11/12/97), 703 So.2d 709. The bank secured payment of its own interest and closing fees from the funds dedicated for hard construction costs. The bank assured NBC that it would dedicate $1.4 million to hard construction costs and that it would release funds on two-party checks and only if applied for on forms signed by both NBC and Dibidale. The bank also promised that it would not release any of the $500,000 retainage to Dibidale unless NBC agreed to the release. Furthermore, the bank did not inform NBC that the construction funds had been depleted. Based on these facts, we find no error in the trial court's finding that the defendants were in bad faith.
*944 The trial court found that the actions and course of conduct followed by the bank and Dibidale destroyed NBC as a business. The actions taken by the defendants caused the plaintiff to remain on the project and even undertake additional work; in short, the defendants' actions masked the fact that funds for the completion of the project were coming from the second construction loan. This lead the plaintiff to believe that Dibidale had an outside money source. However, as NBC found out there was no outside money source. We agree with the trial court that the defendants were solidary obligors and in bad faith.
The trial court treated NBC's contract as a cost plus contract and ordered the defendant to pay all unpaid bills, which totaled $1,524,154. This Court has held that a "fixed price agreement" may be interpreted as a "cost plus agreement" if the contract requires the contractor to document his material and labor costs before receiving payment, if many details are unspecified when the project begins, if the owner asks for better materials after the contractor begins work. Planning Systems Corp. v. Murrell, 374 So.2d 719, 721 (La.App. 4 Cir.1979), writ denied, 376 So.2d 319 and 377 So.2d 843 (La.1979); Wendel v. Maybury, 75 So.2d 379 (La.App. Orl.1954); M. Carbine Restoration, Ltd.v. Sutherlin, 544 So.2d 455 (La.App. 4 Cir. 1989). Clearly, it was not manifestly erroneous for the trial court to treat NBC's contract as a cost-plus contract in the instant case.
For the foregoing reasons, the judgment of the trial court is affirmed. Furthermore, after a careful review of the parties' briefs as well as the entire record we find no reason to maintain their exceptions.
AFFIRMED.
CIACCIO, J., CONCURS IN PART AND DISSENTS IN PART.
CIACCIO, J., concurring in part and dissenting in part.
I find that the trial judge was clearly wrong in holding the Alerion Bank & Trust Company (ABT) solidarily liable with Dibidale for any damages awarded to plaintiffs. I cannot equate the bank's action to bad faith. If the bank breached its agreement by making payments to itself that were authorized by the loan documents the remedy would be an award for that amount based on error. I know of no theory of law that converts a breach of contract to a tort of conspiracy by "intentionally failing to abide by an agreement."
The bank made no representation to Theriot to induce him to continue working on the project or to increase its scope. If such representations were made they were made solely by Dibidale and its representatives.
If any portion of the second loan of $1.4 million was improperly disbursed by the bank to the detriment of NBC it would be limited to the $202,763 paid to the Bank for loan interest and origination fees; $20,000 for land acquisition costs and $3,232 for property taxes (all of which are authorized by the loan documents) or a total of $226,995.
Against this amount I find that the Bank is entitled to a credit of $190,509.38 for the claim of four of NBC's creditors who were paid by the bank and then assigned their claims to the Bank, leaving a balance of $36,485.62.
Accordingly I would reverse the judgment of the trial court insofar as it holds the bank solidarily liable with Dibidale.
I would further reverse the judgment against the Bank reducing it to $36,485.62.
Otherwise, I concur in the judgment.
NOTES
[1] A list of the checks disbursed shows that the 2-party check system was followed faithfully for the 6.5 million dollar loan.
[2] The laborers were paid through a new corporation, Building Resources. Inc., which Mr. Theriot had incorporated to qualify for lower unemployment and workers compensation charges.
[3] Wil Whitmore admitted that closing costs, interest, quitclaim deed, taxes and interim loan reimbursements were a breach of the three-party agreement.
[4] Peter Butler, the attorney for Dibidale, testified that the $1.4 million was for hard construction costs. This was also made clear by the testimony of Wil Whitmore. The trial court did not find credible the testimony of the bank's witnesses that the funds from the second loan were not solely dedicated to NBC's construction costs.