STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-997


GERALD CASTILLE

VERSUS

ST. MARTIN PARISH SCHOOL BOARD



**********


APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 75428
HONORABLE CHARLES L. PORTER, DISTRICT JUDGE

**********

**JIMMIE C. PETERS**
**JUDGE**

**********

Court composed of John D. Saunders, Jimmie C. Peters, and David Kent Savoie, Judges.


**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

G. Karl Bernard
G. Karl Bernard & Associates, LLC
1615 Poydras Street, Suite 220
New Orleans, LA 70112
(504) 412-9953
COUNSEL FOR PLAINTIFF/APPELLANT:
    Gerald Castille

**Mark D. Boyer**
**Boyer, Hebert, Abels & Angelle, LLC**
**1280 Del Este Avenue**
**Denham Springs, LA 70726**
**(225) 664-4335**
**COUNSEL FOR DEFENDANT/APPELLEE:**
　　**St. Martin Parish School Board**

**PETERS, J.**

The plaintiff in this matter, Gerald Castille, appeals a trial court judgment dismissing his contractual damage claims against the St. Martin Parish School Board. For the following reasons, we affirm certain aspects of the trial court judgment, reverse certain aspects, and render judgment in favor of Mr. Castille.

## DISCUSSION OF THE RECORD

Much of the factual background in this litigation is not disputed. Mr. Castille became a school bus driver for the St. Martin Parish School Board (School Board) in 1977, and worked his way through some of the most difficult routes the School Board had to offer until his seniority and tenured status gave him access to better routes.

Mr. Castille began his career on the Levee Route, which at the time traversed long and dangerous gravel roads and was known for having difficult students and parents. A few months later, the School Board moved Mr. Castille to the Portage Route, a similarly difficult route. Approximately one year later, the School Board moved him to the combined Cypress Island and Terrace Highway Route, which was also an undesirable route for a bus driver.

Two or three years later, Mr. Castille moved to the Highway 31 Route, and he remained on that route through the 2007-08 school year. Initially, this route was comparable to the more troublesome routes he had been assigned to in the past, but as the years passed, the route improved. By the end of the 2007-08 school year, he had developed a bond with his student passengers and their parents to the point that he considered them to be "family." Additionally, his passenger population significantly decreased, and he found himself transporting a third generation of students. Because he lived in Iberia Parish, Mr. Castille parked his school bus at his mother's home in St. Martinville and drove his own vehicle to

and from his home twice a day. This maintained the dead miles[1] on the Highway 31 Route to only seven per day.

This litigation has as its origin the action of the School Board in the spring of 2008. Facing increasing diesel fuel costs, the School Board instructed its Transportation Committee to adjust the school bus routes to reduce dead miles on the routes, thereby cutting diesel fuel costs.[2] The Transportation Committee then reconfigured all of the existing routes by adjusting some and combining others. When it came time to assign school bus drivers to the new routes, the assignments were made by assigning each newly reconfigured route to the school bus driver whose home was closest to the beginning of the route. The route closest to Mr. Castille's home and, therefore, the one assigned to him, was a new route comprised of a combination of the old Levee and Portage Routes (Levee/Portage Route).[3]

Mr. Castille became aware of this assignment the day before the Transportation Committee held a public meeting to confirm its actions. At that meeting, the bus drivers with complaints were told that the routes "[were] not written in stone[,]" and if adjustment became necessary, the individual driver's situation would be addressed. Mr. Castille interpreted this to mean that if he did not like his new route after a trial period, he could move back to his Highway 31 Route.[4]

Mr. Castille found the Levee/Portage Route to be as bad as he remembered,

---

[1] "Dead mileage" or "dead miles" refers to any mileage that a bus is operated without students on board.

[2] Nothing in the record suggests that the School Board gave the Transportation Committee any parameters to follow in accomplishing its assigned task.

[3] Ms. Tina Pierre, a former Transportation Committee Secretary, described the Levee Rouge as the "route from hell."

[4] All of the Transportation Committee members who testified agreed that the bus drivers were told that the routes could be adjusted.

and after two weeks, he asked that he be moved back to his former route. According to Mr. Castille, the School Board supervisor, to whom he initially spoke, informed him that he would simply have to deal with his situation as no accommodation would be forthcoming. His requests for assistance from other supervisors and School Board members fell on deaf ears until 2011, when he was assigned a new route based on his seniority.

Mr. Castille's September 28, 2009 petition sought damages in both contract and tort[5] law for the School Board's failure to comply with state tenure laws in assigning him to the Levee/Portage Route beginning in the 2008-09 school year. He later amended his original petition to include a claim for pecuniary and non-pecuniary damages, based on detrimental reliance and the School Board's failure to perform its contractual duties in good faith.

After a two-day trial beginning on May 12, 2014, the trial court took the matter under advisement. In its September 17, 2014 reasons for judgment, the trial court found that the School Board violated the school bus tenure law when it failed to assign the new school bus routes to drivers based on seniority, but dismissed Mr. Castille's claims for breach of contract and detrimental reliance. At the same time, the trial court awarded Mr. Castille damages in the form of repayment in full for any time or salary lost as a result of the School Board's actions, but dismissed his claim for non-pecuniary damages. After the trial court rejected the School Board's motion for reconsideration of the judgment and/or for new trial, Mr. Castille

---

[5] The trial court subsequently dismissed Mr. Castille's tort claims pursuant to the grant of an exception of prescription filed by the School Board. While the record reflects that the trial court certified the prescription judgment as a final judgment, nothing in this record before us indicates that he pursued an appeal on this issue. This leaves only the contract claims for litigation.

perfected this appeal.[6] In his appeal, he raised three assignments of error:

1. The trial court's judgment on [Mr.] Castille's breach of contract claim should be reversed;

2. The trial court's judgment on [Mr.] Castille's detrimental reliance claim should be reversed; and

3. The trial court's judgment on [Mr.] Castille's claim for non-pecuniary damages should be reversed.

**OPINION**

It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* In order to reverse a factfinder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. *Stobart v. State, DOTD*, 617 So.2d 880 (La.1993).

It is equally well settled that when a legal error interdicts the fact-finding process, we no longer apply the manifest error standard; and with a complete record before us, we make our own independent *de novo* review. *Evans v. Lungrin*, 97-0541, 97-0577 (La. 2/6/98), 708 So.2d 731. "A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Id.* at 735 (citation omitted).

---

[6] The School Board filed an untimely answer to Mr. Castille's appeal, and that untimely filing will not be considered.

4

In *West v. State of Louisiana, through State Superintendent of Public Education*, 324 So.2d 579, 581 (La.App. 1 Cir. 1975), the court stated that "[w]e deem it elementary that the relationship of employer-employee is contractual in nature." That being the case, if parties "allege an employer-employee relationship as the basis for their claims, they have alleged a cause of action in contract." *Id.*

Louisiana generally classifies employees as either "at will" or "fixed term" employees. An "at will" employee is, as the name implies, one whose employment may be terminated at any time or for any reason by either the employer or the employee. La.Civ.Code art. 2747. A "fixed term" employee is one whose term of employment is fixed and who, unless terminated for good cause, is entitled to payment for the entire term if the contract is breached by the employer. La.Civ.Code art. 2749. As explained in *Thorne v. Monroe City School Board*, 542 So.2d 490, 491-92 (La.1989) (footnote omitted), teachers and bus drivers employed by the state public school system fit within an exception to the doctrine of at-will employment because of the statutorily established protections given them:

> The Legislature created an exception to the employment-at-will doctrine when it adopted statutes providing permanent tenured positions to teachers and bus-drivers.
>
> The historical purpose of tenure, which originated in higher education, was the protection of academic freedom by preventing arbitrary or repressive dismissal. Quinlan, *State Teacher Tenure Statutes: An Appeal for Repeal*, 9 J. Legislation 144 (1982); Kerwin, *The Part-Time Teacher and Tenure in California*, 10 Golden Gate U.L.Rev. 765 (1980). After the acceptance of tenure in higher education, many state legislatures passed statutes providing for tenure in primary and secondary schools. The need for tenure in lower education has been justified in order to prevent school boards from abusing superior bargaining power in contract negotiation, to provide stability within the teaching profession by assurance of continued service to experienced teachers, and to prevent dismissal for unfounded, political or partisan reasons. *Evans v. Benjamin School District*, 134 Ill.App.3d 875, 89 Ill.Dec. 637, 480 N.E.2d 1380 (1985);

5

*Spiewak v. Board of Education of Rutherford*, 90 N.J. 63, 447 A.2d 140 (1982); *Reed v. Orleans Parish School Board*, 21 So.2d 895 (La.App.Orl.1945); Quinlan, *supra*.

Furthermore, as with the teacher tenure laws, the school bus operator tenure laws are read into and form a part of each school bus operator's contract with their employer. *See Nobles v. Bienville Parish Sch. Bd.*, 198 La. 688, 4 So.2d 649 (1941); *Pizzolato v. State through Bd. of Elementary and Secondary Educ.*, 452 So.2d 264 (La.App. 1 Cir. 1984).

It is not disputed that Mr. Castille has been a School Board school bus driver for thirty-nine years, and as such, an employee of the School Board. La.R.S. 17:491(A). It is also not disputed that as a long-time school bus driver, Mr. Castille had attained the classification of "regular or permanent" driver and was a tenured employee of the School Board. La.R.S. 17:492(A), (C). That being the case, the employer-employee relationship between the School Board and Mr. Castille "is a contractual relationship" and "an employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy." *Newsom v. Global Data Sys., Inc.*, 12-412, 12-413, p. 4 (La.App. 3 Cir. 12/12/12), 107 So.3d 781, 785, *writ denied*, 13-429 (La. 4/5/13), 110 So.3d 595.

Louisiana Revised Statutes 17:493.1(A) makes it clear that when a new school bus route is created, or when an old route becomes vacant, a school board must assign that route based on tenured seniority. That statute provides:

(1)(a) Whenever a school bus operator is needed to drive a new route or a route vacated by a previous operator, the school bus operator who is tenured and has acquired the greatest seniority shall be offered the opportunity to and may change from driving his route to the vacant route before another operator is selected.

(b) If the tenured bus operator with the greatest seniority chooses not to change to the vacant route, the route shall then be

6

offered in order of seniority to a school bus operator who has acquired tenure.

> (c) If no tenured operator chooses to change to the vacant route, the route shall then be offered to a full-time probationary bus operator.

> (d) If no regular bus operator, tenured or probationary, chooses to change to the vacant route, then a substitute bus operator shall be selected for the position from a list of approved substitute school bus operators.

> (2) If a regular bus operator chooses to change routes as provided in this Section, then his vacant route shall be filled using the process described in this Subsection.

The only exception to the requirement that a school board follow the procedure in La.R.S. 17:493.1(A) is found in La.R.S. 17:493.1(C), which reads as follows:

> Only if a city or parish school board is required, in filling a vacant route pursuant to Subsection A of this Section, to bear an increase in unreimbursed costs for nonpassenger miles over those attributable to the previous operator who vacated the route, may a school system select an operator to fill the vacant route on a different basis.

With regard to whether a local school board can circumvent this assignment procedure, La.R.S. 17:494 provides that "[n]othing contained in the Revised Statutes of Louisiana shall be construed as conferring upon any parish school board the authority to make rules and regulations which may impair or nullify the provisions of this Sub-part." In fact, the School Board in this matter adopted internal rules that mirror the requirements of La.R.S. 17:493.1. The School Board's internal rules read, in pertinent part:

> The School Board shall only employ as school bus drivers those persons who have met all state and federal requirements for such positions. Whenever a school bus operator is needed to drive a new route or a route vacated by a previous operator, the school bus operator who is tenured and has acquired the greatest seniority shall be offered the opportunity to and may change from driving his/her route to the vacant route before another operator is selected. If the tenured bus operator with the greatest seniority chooses not to change

7

to the vacant route, the route shall then be offered in order of seniority to a school bus operator who has acquired tenure.

If no tenured operator chooses to change to the vacant route, the route shall be offered to a fulltime probationary bus operator.

If no regular bus operator, tenured or probationary, chooses to change to the vacant route, then a substitute bus operator shall be selected for the position from a list of approved substitute school bus operators. If no tenured, probationary, or substitute bus operator wants the route, then a new driver shall be hired.

. . . .

The School Board may select an operator to fill a vacant route using a different process than outlined above, but **only** if the Board is required to bear an increase in the unreimbursed costs for nonpassenger miles over those attributed to the previous operator who vacated the route.

Whenever a vacancy occurs on a route due to death, resignation, retirement, or the expiration of the regular operator's approved leave, or a new route is established, the route shall be filled with a regular school bus operator using the process stated above no later than the following school year unless the route is consolidated or eliminated.

If an operator is on approved leave, his/her route shall not be considered a vacant route. A substitute shall be used to drive a route for an operator on approved leave regardless of the length of time of the approved leave.

In its written reasons for judgment, the trial court recognized that the School Board violated Mr. Castille's "tenure and seniority rights" in assigning him to the to the Levee/Portage Route, and awarded Mr. Castille damages for the School Board's failure in this regard. However, the trial court's rejection of Mr. Castille's breach of contract claim is inconsistent with this obviously correct factual finding as the trial court failed to recognize that the employee/employer relationship between Mr. Castille and the School Board is a contractual relationship. Thus, we find legal error in the trial court's conclusion that the School Board had breached no contractual relationship with Mr. Castille. Because of that error, our review is *de novo*.

8

The evidentiary record before us establishes that both prior and subsequent to the Transportation Committee's action in the spring of 2008, the School Board followed the tenure/seniority statutory requirements in filling new and vacant bus routes. In fact, Mr. Castille obtained his Highway 31 Route, as well as a new route in 2011, by virtue of his seniority at the time. However, in the spring of 2008, the Transportation Committee abandoned any semblance of complying with the statutory authority or its own local rules with regard to tenure and seniority, and based all assignments on nothing more than the proximity of the potential bus driver's home to the beginning of the route being assigned.

The School Board justified this method of assignment by pointing to the savings in fuel costs and by explaining that every school bus driver is paid for five hours per day, regardless of the length of his or her route. Since everyone was treated the same financially, the School Board argued, they should have no complaint with regard to the route assigned. In fact, Herbert Thibodeaux, the School Board's bus manager and member of the Transportation Committee, was adamant in his testimony that seniority should not be considered in the assignment of routes unless it was feasible to do so. In other words, tenure and seniority were the least of the factors to be considered when reorganizing the entire system. Besides, the School Board argues, Mr. Castille had every opportunity to come to the Transportation Committee meetings and add his personal input into the process and, thereby, protect his individual rights.

The problem with the School Board's argument is that in ignoring the statutory mandate of La.R.S. 17:493.1(A), as well as its own internal rules, it opened up the process to the abuse the statutes and its local rules were designed to

avoid.[7] Given that the only criteria for assigning a route to a school bus driver was the close proximity of the starting point of the route to his or her home, the Transportation Committee had the absolute power to control the assignments. That being the case, the Transportation Committee could reward or punish drivers at its sole discretion. It could, as it did in the case of Mr. Castille, discriminate against long-time employees without giving any due process to that employee's statutory and local-rule rights. Additionally, it allowed the Transportation Committee to disregard La.R.S. 17:493.1(C)'s requirement that the unreimbursed costs for nonpassenger miles borne by the School Board be calculated in each individual situation, rather than with a blanket provision across the board. Mr. Castille's history of parking his bus in St. Martinville, which saved the School Board dead miles, explains why an across the board generalized-assignment policy is not necessarily in the best interests of the School Board and certainly does not comply with the tenure/seniority statutory requirements. Finally, Mr. Castille was not required to attend the Transportation Committee meetings in order to protect his position, because state law afforded him that protection. Clearly, the School Board breached the employee/employer contract between itself and Mr. Castille.

Mr. Castille argues also that the trial court erred in dismissing his claim for detrimental reliance against the School Board. We agree with this argument as well.

The doctrine of detrimental reliance is codified in La.Civ.Code art. 1967, which reads as follows:

Cause is the reason why a party obligates himself.

---

[7] In this matter, Mr. Castille introduced evidence which he claims established that certain members of the Transportation Committee showed favoritism toward less-experienced bus drivers, based on personal or political factors. This favoritism, Mr. Castille claims, led to the Transportation Committee designating starting points of the newly designed routes which guaranteed that the less-experienced drivers would be assigned the more favorable routes.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

In *Luther v. IOM Co. LLC*, 13-353, pp. 10-11 (La. 10/15/13), 130 So.3d 817, 825, the supreme court set forth the elements of proof required in a detrimental reliance case:

The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. *Suire v. Lafayette City-Parish Consolidated Government*, 2004-1459 (La.4/12/05), 907 So.2d 37, 59. Estoppels are not favored in our law; therefore, a party cannot avail himself of that doctrine if he fails to prove all essential elements of the plea. *See Wilkinson v. Wilkinson*, 323 So.2d 120, 126 (La.1975).

Moreover, a plaintiff who suffers no damages as a result of his reliance on a promise has not proven detrimental reliance. *Jackson v. Lare*, 34,124 (La.App. 2 Cir. 11/1/00), 779 So.2d 808.

The foundation of Mr. Castille's detrimental reliance claim arises from the comments made by the Transportation Committee members at the 2008 meeting when various bus drivers, including Mr. Castille, raised questions concerning their assigned routes. While the testimony from those attending varied to some degree, all agreed that the bus drivers were told that the routes were not set in stone, and that if problems arose after a couple of weeks on the route, the assignments could be "tweaked" to some extent. Mr. Castille discovered rather quickly that no assistance was to be forthcoming from either the Transportation Committee or the

11

School Board, despite his complaints.[8]

The evidence supports a finding that the School Board, through the Transportation Committee, promised Mr. Castille that the assignment of the new route could be revisited after a trial period; that Mr. Castille justifiably relied on that promise; and that the School board changed its position on that promise to the detriment of Mr. Castille. Thus, we find that the trial court erred in rejecting Mr. Castille's detrimental reliance argument.

*Damages*

In 1987, Mr. Castille was diagnosed with anxiety and depression disorders, but maintained control of these conditions with medication. According to Mr. Castille, these conditions manifested themselves in relation to his employment as a bus driver. Additionally, he provided the School Board with documentation at the beginning of each school year, concerning his condition and the medications he was taking; and he had done so since the conditions began in 1987.

According to Mr. Castille, his anxiety and depression periods became more frequent after his assignment to the newly created Levee/Portage Route in 2008. When these conditions flared up, he began having difficulty concentrating and focusing on the safety of his student passengers. His condition became so severe that he was forced to take medical leave for the periods from August 17 through August 28, 2009; November 11 through November 29, 2010; and March 15 through April 5, 2011. However, once he acquired the new route in 2011, these disorders became more stable, and he missed no work whatsoever for his first two years on that route.

Mr. Castille's wife, Myra, supported her husband's testimony concerning his

---

[8] In fact, when Mr. Castille continued to complain, a supervisor threatened to "write him up" for insubordination.

depression and anxiety history and further noted that between 2008 and 2011, he was angry all the time, their marital relationship deteriorated, and their home became "a living hell," because all he could think of was his work situation. She also agreed with her husband that his disorders manifested themselves much less often after he obtained the new route in 2011.

In September of 2009, Dr. Shelly Savant, a New Iberia psychiatrist and neurosurgeon, first began seeing Mr. Castille for evaluation and treatment of his preexisting depression and anxiety conditions. Dr. Savant's initial diagnosis was that of generalized anxiety, with distinct episodes of panic attacks, both of which she classified as anxiety disorders; and with major depressive symptoms. Dr. Savant described generalized anxiety as nervousness or anxiousness, which manifests itself as excessive worrying and difficulty in maintaining a train of thought. She noted that a panic disorder manifests itself in distinct episodes, lasting approximately twenty minutes and exhibiting debilitating symptoms such as shortness of breath; sweating; a sense of impending doom; or a fear of leaving home. Given Mr. Castille's medical history, Dr. Savant opined that Mr. Castille was predisposed to suffering from both anxiety and depression.

According to Dr. Savant, Mr. Castille initially complained of increasing panic attacks with chest pain, shortness of breath, sweating, and generalized or excessive worries about a number of things. While she categorized these initial findings as only anxiety complaints, Dr. Savant noted that later in her treatment, Mr. Castille developed depressive symptoms, which varied from being simply depressed to becoming very irritable.

Dr. Savant concluded that although Mr. Savant was predisposed to periods of anxiety and depression, his condition at the time of her treatment was caused by

13

his difficult work situation. She identified his work situation as the major underlying stressor giving rise to his anxiety and depression periods. The transfer in 2008, according to Dr. Savant, was such a major change in Mr. Castille's life that it gave rise to the severe and regular episodes of anxiety and depression he suffered from the beginning of the 2008 school year through the beginning of the 2011 school year.

According to Dr. Savant, recognition of the major stressor causing Mr. Castille's anxiety and depression episodes was only the first step in his treatment. The perpetuating nature of the daily Levee/Portage Route made it very difficult to find a way to gain control over the situation. Not only did she have to find the appropriate medication to control his symptoms, but she also had to cope with Mr. Castille's reactions to the daily repetition of the event giving rise to the anxiety and depression periods. It was not until his route changed in 2011 that his symptoms became easier to control. Dr. Savant was of the opinion that the events of 2008 precipitated Mr. Castille's anxiety and depression episodes; and these episodes were basically continuous until the beginning of the 2011 school year.

Sometime during her treatment of Mr. Castille, Dr. Savant referred her patient to Cindy Hayes, a New Iberia, Louisiana psychotherapist and Licensed Clinical Social Worker, whose practice focuses on environmental stressors. Ms. Hayes agreed with Dr. Savant that his assignment to the Levee/Portage Route precipitated Mr. Castille's elevated symptoms of depression and anxiety. She explained that persons suffering from anxiety and depression thrive on consistency and predictability in their lives, and the action of the School Board in 2008 deprived him of these stabilizing factors and caused him to develop a sense of injustice and betrayal. According to Ms. Hayes, the ancillary elements of shame

and embarrassment suffered by Mr. Castille were also directly related to the School Board's action. This came in the form of the ridicule from his fellow school bus drivers Mr. Castille had to endure after he was dropped to the bottom of the seniority list through his assignment to the Levee/Portage Route.

Ms. Hayes's diagnosis was that of depression and anxiety, with an adjustment disorder from a precipitating stressor. She stated that symptoms related to these diagnoses include: insomnia; impaired ability to think or concentrate; difficulty making decisions; easily distracted; memory difficulties; tearfulness; agitation; irritability; brooding; anxiety; worry; somatic complaints with headaches or muscle tension or aches; difficulty in intimate relationships; difficulty in sexual function; and loss of libido or interest. Based on the history he provided, as well as her evaluation of the patient, she stated that Mr. Castille presented with nearly all of these symptoms.

Ms. Hayes did not find Mr. Castille's pre-2008 history of depression and anxiety to be a factor in his current situation. According to Ms. Hayes, his underlying problems had stabilized and required only maintenance checks. However, at the outset of her treatment, she noted that Mr. Castille appeared to be extremely fragile and anxious and that he was very depressed. Although she was of the opinion that these symptoms were treatable, she explained that what made Mr. Castille's condition so difficult to treat was the continuing nature of his stressor, which she described as enduring circumstances.

With regard to the question of damages, Mr. Castille first argues that the trial court erred in finding that his exclusive remedy for damages, based on his purported injury, was barred by workers' compensation law. We agree.

The Workers' Compensation Act, which, in actuality, is a subset of the general tort law, provides tort immunity to employers, whose workers are injured during in the course and scope of their employment. In *Harris v. State ex rel. Department of Public Safety & Corrections*, 05-2647, p. 6 (La.App. 1 Cir. 11/3/06), 950 So.2d 795, 799 (alteration in original), *writ denied*, 06-2817 (La. 3/9/07), 949 So.2d 440, the first circuit stated:

> Louisiana Revised Statutes 23:1031 and 1032 set out the basic tenets of contemporary workers' compensation law in Louisiana. Generally speaking, the workers' compensation regime represents a *quid pro quo* compromise of interests: "the employee receive[s] an absolute right to recover limited benefits in exchange for the employer's tort immunity." Frank L. Maraist & Thomas C. Galligan, The Employer's Tort Immunity: A Case Study in Post-Modern Immunity, 57 La. L.Rev. 467, 473 (1997). A plaintiff may recover greater amounts through tort litigation but it is a riskier strategy than accepting workers' compensation. The employer is likely to defend itself vigorously and a loss for the plaintiff will likely foreclose attempts to pursue workers' compensation after the fact. *Id.* at 476.

Accordingly, employees injured during the course and scope of their employment receive workers' compensation benefits, unless injured as a result of horseplay or non-employment related disputes; and employers are generally shielded from tort suit unless their employees' injuries result from intentional acts. La.R.S. 23:1031; La.R.S. 23:1032.

However, as previously noted, Mr. Castille's claims are contractual and quasi-contractual in nature. In fact, all of his original tort claims have been dismissed as having prescribed. Louisiana Revised Statutes 23:1032 does not preclude Mr. Castille from bringing suit against the School Board based on contractual/quasi contractual claims. That being the case, we find that the trial court legally erred in holding that Mr. Castille's exclusive remedy for his claims was workers' compensation.

16

Because the trial court erred, as a matter of law, in rejecting Mr. Castille's breach of contract and detrimental reliance claims and in concluding that any damage he suffered was covered by the Louisiana Workers' Compensation Act, it follows that we must consider the issue of damages *de novo* as well.

A contract is a conventional obligation described as "an agreement by two or more parties whereby obligations are created, modified, or extinguished." La.Civ.Code art. 1906. With regard to the recovery of damages under a conventional obligation, La.Civ.Code art. 1994 provides that "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation[,]" and that "[a] failure to perform results from nonperformance, defective performance, or delay in performance." Additionally, "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La.Civ.Code art. 1995.

One factor affecting the calculation of damages is whether the obligor was in good or bad faith at the time the breach occurred. La.Civ.Code arts. 1996 and 1997. In *Favrot v. Favrot*, 10-986, pp. 16-18 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, 1109-10 (alteration in original) (footnote omitted), *writ denied*, 11-636 (La. 5/6/11), 62 So.3d 127, the fourth circuit discussed the effect that a breaching obligor's good or bad faith will have on an award of damages:

> Judicial inquiry, however, into an obligor's (or even in some cases an obligee's) good-faith performance of the obligation is not triggered by the morality of a party's intentions, but is initiated only when the obligee has proven a *failure to perform* an obligation. Stated another way, we do not examine a party's good faith (or bad faith) *unless and until* we find that the party has failed to perform an obligation, from which the obligee has sustained damages. "An obligor is liable for damages caused by his failure to perform a conventional obligation." LA. CIVIL CODE ART. 1994. The extent of the obligee's recoverable damages is then determined according to whether the obligor failed to perform in good faith or in bad faith. "An obligor in good faith is liable only for the damages that were

foreseeable at the time the contract was made." LA. CIVIL CODE ART. 1996. In contrast, "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." LA. CIVIL CODE ART. 1997; *see also* Revision Comments-1984 (b) ("An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.").

Thus, judicial determination of good-faith (or bad-faith) failure to perform a conventional obligation is always preceded by a finding that there was a failure to perform, or a breach of the contract. *See, e.g., Delaney v. Whitney Nat'l Bank*, 96-2144, p. 18 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 718 (where terms of a nonqualified retirement plan and an Excess Plan agreement between employer and employee were at issue, the evidence showed "disagreement and confusion" but not "deliberate malice." This court stated, "Bad faith generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties."); *Adams v. First Nat'l Bank of Commerce*, 94-0486, p. 2 (La.App. 4 Cir. 9/29/94), 644 So.2d 219, 222 (where a home mortgage note was at issue, "a breach of contract occurs if *contractual* discretion is exercised in bad faith, a term connoting fraud, deception, or sinisterly-motivated nonfulfillment of an *obligation.*" (emphasis in original)); *Roba, Inc. v. Courtney*, 09-0508, p. 10 (La.App. 1 Cir. 8/10/10), 47 So.3d 500, 508 (where a breach of contract for right of way on land was at issue, bad faith consisted of "designed breach of . . . [a contract] from some motive of interest or ill will"); *MKR Services, L.L.C. v. Dean Hart Constr., L.L.C.*, 44,456, p. 7 (La.App. 2 Cir. 7/8/09), 16 So.3d 562, 566 (where a breach of contract for construction of an apartment complex was at issue, "The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives."); *Nat'l Building & Contracting Co., Inc., v. Alerion Bank & Trust Co.*, 99-2561, p. 9 (La.App. 4 Cir. 11/8/00), 772 So.2d 938, 943 (where a construction loan agreement was at issue, obligors in bad faith owed "all damages foreseeable or not that were a direct consequence of their failure to perform under the agreements with NBC"); *Galloway v. Tenneco Oil Co.*, 313 So.2d 317, 321 (La.App. 4th Cir.1975) (where a written option to purchase land was at issue, "if the debtor is not in bad faith the creditor is entitled [only] to loss of profits that were contemplated or foreseen by the parties at the time of the agreement.").

Another factor to be considered is whether the damages can be categorized as pecuniary or nonpecuniary. With regard to the recovery of nonpecuniary damages, La.Civ.Code art. 1998 provides:

Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary

interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.

Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.

In *Blair v. Bad Boy Inc.*, 48,953, pp. 13-14 (La.App. 2 Cir. 4/9/14), 137 So.3d 1223, 1231, the second circuit clarified what constitutes a nonpecuniary interest:

A "nonpecuniary loss" means damage of a moral nature which does not effect a "material" loss or tangible part of a person's patrimony. *See* Saul Litvinoff, "Moral Damages," 38 La. L.Rev. 1 (1977). The gratification of a nonpecuniary interest means one intended to satisfy an interest of a spiritual order, such as a contract to create a work of art, or a contract to conduct scientific research, or a contract involving matters of sentimental value. In such a case, upon the obligor's failure to perform, the obligee may recover the damages he has sustained of a nonpecuniary--or "moral"--nature. *See* Litvinoff, *supra*. Thus, if a horse is bought for the purpose of showing it at an exhibition, the purchaser is entitled to recover for his disappointment and inconvenience if the contract is rescinded because of a redhibitory vice. *See Smith v. Andrepont*, 378 So.2d 479 (La.App. 1 Cir.1979), *writ denied*, 380 So.2d 102 (La.1980).

Under La. C.C. art. 1998, if it is established that the obligee intended to gratify a significant nonpecuniary interest, and the nature of the contract supports this, and the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, then the requirements for recovery of nonpecuniary damages are satisfied. *Young* [*v. Ford Motor Co., Inc.*, 595 So.2d 1123 (La.1992)]; *Davis v. Sweeney*, 44,997 (La.App. 2 Cir. 3/03/10), 31 So.3d 1184; *Stonecipher v. Mitchell*, 26,575 (La.App. 2 Cir. 5/10/95), 655 So.2d 1381. Whether the gratification of some nonpecuniary interest is a principal object of a contract is a question of fact. *Id.*

Mr. Castille argues that the legislature, by requiring that the assignment of routes be based on seniority, "intended to gratify the non-pecuniary interest of its most tenured bus operators." Thus, he argues that due to his status as a tenured bus driver with seniority, his employment contract with the School Board was intended to gratify a nonpecuniary interest; and he should be awarded those damages.

In this matter, although we find that the School Board's breach was in bad faith, we do not find that Mr. Castille is entitled to nonpecuniary damages. The contract between Mr. Castille and the School Board was strictly an employee/employer contract intended to do nothing more than provide the School Board with school bus drivers to transport children to and from school. Had the legislature intended for such damages to be awarded based on a violation of the school bus operator tenure laws, it could have provided so; and Mr. Castille has provided us with no authority to the contrary. Thus, we find no error in the trial court's denial of Mr. Castille's claim for nonpecuniary damages.

The bad faith damage issue, however, presents an entirely different situation. The School Board rejected Mr. Castille's tenure and seniority rights in the face of statutory authority, its own local rules, and its well-established School Board policy. In fact, after its venture into ignoring school bus drivers' tenure and seniority rights in assigning routes, the School Board reverted to its previous policy of filling vacant and new routes pursuant to tenure and seniority. When Mr. Castille attempted to exert his rights, he was told to cease complaining or face disciplinary action. Despite all of the professed good reasoning for taking this action, it was not an honest mistake. It was a specific refusal by the School Board to fulfill its contractual obligations. If one were to consider the fact that ignoring tenure and seniority rights allowed the Transportation Committee to favor a less-senior driver over a more-senior driver by the simple act of placing the route's beginning point closer to the less-senior driver's home, its action in that regard constituted a nonfulfillment of an obligation for sinister or morally-questionable motives. To reach any other conclusion would render the school bus drivers' tenure and seniority rights of no moment. A school board could act toward a

tenured employee in any way it wished, and the only penalty would be the payment of salary and benefits. If the tenured employee was to continue working, as most would have to do, a school board would be able to violate the law with impunity. This case is a prime example of that very situation. The trial court awarded Mr. Castille repayment of any time or salary lost as a result of the School Board's actions, of which there was none because he continued to work under the stressful circumstances created by the reassignment.

On appeal, Mr. Castille seeks to recover damages for the increased periods of anxiety and depression he suffered between the beginning of the 2008-09 school year and the beginning of the 2011-12 school year. While Mr. Castille was predisposed to bouts of anxiety and depression, a fact which the School Board was made aware of each year through the records supplied by Mr. Castille, these episodes increased substantially after his assignment to the "route from hell," as described by Ms. Pierre. Both Dr. Savant and Ms. Hayes causally connected these new and increasing episodes to the action of the School Board in rejecting Mr. Castille's tenure and seniority rights.

Given the record before us, we find that the School Board is "liable for all damages, foreseeable or not, that are a direct consequence of [its] failure to perform." La.Civ.Code art. 1997. Thus, the School Board is liable to Mr. Castille for the acceleration of his episodes of anxiety and depression caused by its actions. We set that damage amount at $75,000.00.

## DISPOSITION

Based on the foregoing, we reverse the trial court's dismissal of Gerald Castille's claims against the St. Martin Parish School Board for breach of contract and detrimental reliance and award Gerald Castille judgment against the St. Martin

Parish School Board in the additional amount of $75,000.00.  We affirm all other aspects of the trial court judgment.  We assess all costs of these proceedings to the St. Martin Parish School Board.  Pursuant to La.R.S. 13:5112(A), the  trial court costs of $6,728.29 and the appeal costs of $1,391.50 are assessed to the St. Martin Parish School Board.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**